E-FILED
Thursday, 06 July, 2006  10:58:13 AM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>GREIGORY HOLMES,<br><br>Petitioner,<br><br>vs.<br><br>DONALD HULICK, Warden,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No.  06 C 2090<br><br>The Honorable<br>Harold A. Baker,<br>Judge Presiding. |

---

## ANSWER

Now comes respondent, by his attorney, Lisa Madigan, Attorney General of Illinois, and pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, asks that the above-captioned amended petition for writ of habeas corpus be denied for the following reasons.  In support thereof, he states:

1.    Petitioner, Greigory Holmes,[1] identified as prisoner number K-04785, is in the custody of Donald Hulick, acting Warden of Menard Correctional Center.

2.    On December 23, 1997, in the Circuit Court of Macon County, a jury found petitioner guilty of three counts of home invasion, one count of armed violence, and nine counts of aggravated criminal sexual assault; he was sentenced to an aggregate

---

[1]  Petitioner was known as Gregory Holmes throughout the pendency of his state proceedings, is listed as "Gregory" by the Illinois Department of Corrections, and in places in his petition refers to himself as "Gregory."  However, in the interest of consistency, respondent will follow the caption's identification of petitioner's first name as "Greigory."

of 115 years of imprisonment. *See* Order of Illinois Appellate Court, in <u>People v. Holmes</u>, No. 4-98-0768, filed April 28, 2000. #2-1, pp. 24-53.[2]

3.    Petitioner appealed to the Illinois Appellate Court, Fourth District, raising seven issues: (1) the prosecution's elicitation of petitioner's assertion of his right to remain silent was reversible error; (2) the trial court erred in denying him a fair trial due to: (a) improper racial remarks made by the prosecutor; (b) failing to evaluate the competency of a child witness; and (c) trial counsel's incompetency in failing to object to the racial remarks and make a competency objection to the testimony of the child witness; (3) the State failed to prove him guilty beyond a reasonable doubt as to count XIII of the information which charged aggravated criminal sexual assault; (4) the trial court erred in denying petitioner's motion for the substitution of judge, where the trial judge made prejudicial remarks at a political function concerning defendant's likely sentences; (5) petitioner's aggregate sentence of 115 years in prison was excessive; (6) petitioner was entitled to one additional day of sentence credit; and (7) resentencing was required for his armed violence conviction because the sentence he received violated the single subject rule of the Illinois Constitution. <u>Id</u>. On April 28, 2000, the appellate court affirmed in part, vacated in part, and remanded. The appellate court affirmed the issues pertaining to the petitioner's guilt and most of his sentences, but agreed that the sentence he received for armed violence was void under the single

---

[2] Citations preceded by #2-1 refer to pages of the habeas petition and supporting documents as paginated by this Court's clerk's office.

subject rule, vacated it and remanded for resentencing.[3]  Id.

4.    Petitioner filed a petition for leave to appeal (PLA) in the Illinois Supreme Court raising five issues:  (1) the trial court erred in denying petitioner's motion to substitute the judge after the trial but before sentencing; (2) the prosecution's elicitation of petitioner's assertion of his right to silence was error; (3) ineffective assistance of counsel for counsel's failure to:   (a) object to prosecutor's racial remark and (b) request a competency hearing for witness J.W.[4]; (4)  petitioner was not proven guilty beyond a reasonable doubt; and (5) petitioner's sentence of 115 years was excessive.  *See* respondent's Exh. A (PLA in <u>People v. Holmes</u>, No. 89519).  On July 5, 2000, the PLA was denied.  *See* Order of Illinois Supreme Court, in <u>People v. Holmes</u>, No. 89519, filed July 5, 2000. #2-2, p. 2 of 26.

5.    Petitioner sought certiorari in the United States Supreme Court, but on December 4, 2000, the Supreme Court denied his petition.  *See* respondent's Exh. B (Order of United States Supreme Court in <u>Holmes v. Illinois</u>, No. 00-6443, filed December 4, 2000).

---

[3] The appellate court also found petitioner was entitled to the additional day of credit.  That issue is not presented in the instant habeas petition.

[4] While petitioner uses J.W.'s full name, respondent will simply refer to him by his initials.  *See* <u>Report of the Judicial Conference Committee on Court Administration and Case Management on Privacy and Public Access to Electronic Case Files</u>, at http://www.privacy.uscourts.gov/Policy.htm (Jun. 5, 2006).  The report specifies that, "If the involvement of a minor child must be mentioned, only that child's initials should be used; if an individual's date of birth is necessary, only the year should be used . . ." (<u>Id</u>.).

3

6.    On remand, the circuit court resentenced petitioner to 10 years' imprisonment for the armed violence conviction, with the sentence running consecutively to the other sentences.  *See* Order of Illinois Appellate Court, in <u>People v. Holmes</u>, No. 4-00-0962, filed April 19, 2004.  #2-2, pp. 9-21 of 26.  After a motion to reconsider was denied, petitioner appealed, arguing that his aggregate sentence was unauthorized by law and therefore void, because it exceeded the maximum term authorized under 730 ILCS 5/5-8-2 for the two most serious felonies involved.  <u>Id</u>.  The appellate court affirmed.  <u>Id</u>.    Petitioner filed a PLA raising the same issue (*see* respondent's Exh. C (PLA in <u>People v. Holmes</u>, No. 98477)), but the PLA was denied on October 6, 2004.  *See* Order of Illinois Supreme Court, in <u>People v. Holmes</u>, No. 98477, filed October 6, 2004.  #2-2, p. 22 of 26.  Petitioner sought certiorari in the United States Supreme Court.  On April 18, 2005, the Supreme Court denied his petition.  *See* letter from United States Supreme Court regarding <u>Holmes v. Illinois</u>, No. 04-8717, dated April 18, 2005 and incorporated by this Court as #2-2, p. 23 of 26 of the habeas petition.

7.    In December of 2000, while his direct appeal was prending, petitioner filed a post-conviction petition ("PC petition") in the Circuit Court of Macon County, raising one issue:  the consecutive sentences he received violated <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).  *See* Order of Illinois Appellate Court, in <u>People v. Holmes</u>, No. 4-02-0811, filed August 19, 2003.#2-2, pp. 3-6 of 26.   The circuit court denied the petition.  <u>Id</u>.  The appellate court affirmed.  <u>Id</u>.    Petitioner filed a PLA, but it was denied on December 3, 2003.  *See* Order of Illinois Supreme Court, in <u>People v. Holmes</u>, No.

4

97068, filed December 3, 2003. #2-2, p. 7 of 26. On June 1, 2004, the Supreme Court denied petitioner's petition for certiorari in the United States Supreme Court. *See* respondent's Exh. D (Order of United States Supreme Court in <u>Holmes v. Illinois</u>, No. 03-9587, filed June 1, 2004).

8.     On May 8, 2006, petitioner filed the instant petition for habeas corpus relief under 28 U.S.C. § 2254.  He raises the following issues for this Court's review: (1) petitioner's counsel was ineffective for failing to:  (a) object to the prosecutor's racial remark and (b) request a competency hearing for witness J.W.; (2) the trial court erred in imposing consecutive sentences based on factors not proven to the jury;  (3) the consecutive sentences he received totaling 110 years are void and should be modified to 60 years; (4) the prosecutor improperly elicited testimony on petitioner's right to silence; (5) the State did not prove petitioner guilty beyond a reasonable doubt on count XIII (aggravated criminal sexual assault); (6) the trial court erred in sentencing petitioner to an aggregate sentence of 115 years; (7) violation of due process when certain evidence was not presented at trial; (8) testimony that contradicted petitioner's account (of his actions) was improperly admitted; and (9) petitioner was made to go to trial with a biased jury since the jury had experienced acts that he was accused of committing. *See* Pet. at 9-20.

9.     Petitioner has exhausted his state remedies as required by 28 U.S.C. §2254(b), in that he has no further state court avenues of review.  Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, the following state court materials, deemed relevant by respondent, have been filed as

exhibits under separate cover to supplement the materials petitioner included with his petition:

Exhibit A:   PLA in <u>People v. Holmes</u>, No. 71191;

Exhibit B:   Order of the United States Court, denying petitioner's petition for *certiorari*, <u>Holmes v. Illinois</u>, No. 00-6443, filed December 4, 2000;

Exhibit C:   PLA in <u>People v. Holmes</u>, No. 98477;

Exhibit D:   Order of the United States Court, denying petitioner's petition for *certiorari*, <u>Holmes v. Illinois</u>, No.03-9587, filed June 1, 2004; and

Exhibit E:   Copy of docket  in <u>Holmes  v. Hulick</u>, 06-2090, United States District Court for the Central District of Illinois.

The entire state court record is not filed with this answer as the petition can be disposed of based upon the filed pleadings. *See* <u>Simental v. Mastrisciano</u>, 363 F.3d 607, 612 (7th Cir. 2004) (decision whether transcripts are necessary left to discretion of district court; review of state court records quite rare);  *see also* <u>United States ex rel. Green v. Greer</u>, 167 F.2d 585, 586-590 (7th Cir. 1981) (examination of record not required if petitioner fails to identify any incompleteness or inconsistencies in the facts before the district court).

## Argument in Opposition to the Petition

### 1.     Petitioner's habeas petition is time-barred

.     The AEDPA became effective on April 24, 1996 and imposed, under 28 U.S.C. § 2244 (d), a one-year statute of limitations for filing Section 2254 petitions for a writ of habeas corpus. Section 2244 (d) provides that:

(1)    A 1-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

  (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

  (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

  (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court, and made retroactively applicable to cases on collateral review; or

  (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Under 2244(d), petitioner's habeas petition is time-barred.

Petitioner's petition for writ of certiorari grounded on a resentencing claim was denied by the United States Supreme Court on April 18, 2005. *See* letter from United States Supreme Court dated April 18, 2005 and incorporated by this Court as #2-2, p. 23 of 26 of the habeas petition. Thus, at worst, the one-year clock for petitioner to file for federal habeas relief began on April 19, 2005.

First, other than his resentencing claim, petitioner had no issues pending in any court after June 1, 2004, when the United States Supreme Court denied certiorari on

7

his collateral appeal. Thus, if those claims were not presented to a federal habeas court by June 1, 2005, they could be considered untimely when raised in a later federal habeas petition. *See* United States v. Wilson, 256 F.3d 217, 219-220 (4th Cir. 2001). In Wilson, a case brought under 28 U.S.C. § 2255, the Circuit Court held that the statute of limitations for individual counts runs from a decision of the United States Supreme Court denying certiorari notwithstanding that a final judgment had not been entered on all counts. Specifically, while a single conspiracy count had been vacated, that vacatur had no effect on Wilson's other convictions. Wilson, 256 F.3d at 219, 220. The Court made clear that Wilson's case was being remanded only on the single conspiracy count. Id. *See also* Fielder v. Varner, 379 F.3d 113 (3rd Cir. 2004, written by now Justice Alito) (holding that the statute of limitations set out in § 2244(d)(1) should be applied on a claim-by-claim basis).

While Wilson and Fielder have not been unanimously followed by other federal courts (*see* Lewis v. Maine, 254 F.Supp.2d 159, 164 n.5, (U.S.D.C. Maine, 2003)) (holding that "[F]ollowing such a piecemeal approach to judgments of convictions does not serve this court's interest in resolving habeas challenges to state court judgments in one coherent, efficient review"); United States v. Hayes, 2006 WL 851184, *2 (E.D. La., March 13, 2006). This Circuit has not squarely addressed the issue of whether individual claims can be found untimely prior to the disposal of the entire judgment. *But see* Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997) (under 28 U.S. § 1257, an issue of federal law may be reviewed as final even though the decision or judgment is not final as the state system understands the term); Richardson v. Gramley, 998 F.3d

8

463, 467 (7th Cir. 1993).

The reasoning of <u>Wilson</u> and <u>Fielder</u> should be followed by this Court. As <u>Wilson</u> notes, the clear intent of Congress in passing the AEDPA was to limit collateral review of stale claims (since the AEDPA did away with allowing a petitioner to collaterally attack his conviction at any time in a § 2255 motion) and the Court noted that allowing review of <u>Wilson</u>'s non-conspiracy convictions would frustrate that goal, since each had been final for longer than a year. <u>Wilson</u>, 256 F.3d at 220. In <u>Fielder</u>, the Circuit Court noted that in both civil and criminal cases, statutes of limitations are typically applied on a claim-by-claim or count-by-count basis. *See* <u>Fielder</u>, 379 F.3d at 118. The Court also noted that the intent of Congress regarding finality would be frustrated if the door was open to allow the assertion of claims that had become time-barred years earlier. <u>Id</u>. at 120. Thus, in accordance with <u>Wilson</u> and <u>Fielder</u>, this Court should conclude every issue petitioner raised other than his resentencing issue is untimely because of his failure to include them in a federal habeas petition filed before June 1, 2005.

Moreover, even if the individual claims made in his habeas petition are not held to be untimely after June 1, 2005, *the petition itself* is still untimely. For a habeas petition to be timely filed, the petitioner must not only have filed the actual petition within one-year from the conclusion of the state proceedings, but also simultaneously must have either paid the filing fee or filed an application in the district court for leave to proceed *in forma pauperis*. *See* Rule 3(a) of the Rules Governing Section 2254 Cases in the United States District Courts (a petition . . . *shall . . be accompanied by the filing fee* prescribed by law unless petitioner applies for and is given leave to prosecute the

petition in *forma pauperis*) (emphasis added); *see also* <u>Benton v. Washington</u>, 106 F.3d 162, 164-165 (7th Cir. 1996) (payment of filing fee, or a grant of leave to proceed in *forma pauperis*, is one of requirements of Rule 3(a); noncompliance means that petition should be returned under Rule 2(e)).  Thus, for petitioner's habeas petition to have been considered timely, he needed to file or mail the petition by April 19, 2006.  *See* <u>Jones v. Bertrand</u>, 171 F.3d 499, 503 (7th Cir. 1999) (filing date for a habeas petition is when petitioner hands petition to prison officials for mailing).  Furthermore, the petition must be accompanied by the filing fee or the motion for leave to file in *forma pauperis*.  Petitioner did not meet these requirements.

Petitioner acknowledges that he mailed his petition *after* April 19, 2006 (*see* letter of May 1, 2006, *cited supra*), and there is no proof that he filed his fee in a timely manner.  Petitioner attaches to his petition two letters he mailed to the Clerk of this Court that discuss the procedural circumstances surrounding the filing of his petition.  An examination of each shows that petitioner's habeas petition is not timely.  The first letter, dated April 25, 2006, is identified by this Court's docketing system as #1-2, p. 2 of 2.  In it, petitioner writes that the Clerk should have gotten his filing fee because he mailed it April 2, 2006.  *See* letter.  If true, such information does not show that petitioner's habeas petition was accompanied by the filing fee — petitioner *did not mention sending his petition and he did not even sign* his habeas petition until April 4, 2006, (#2-1, p. 22 of 53).  Consequently, the habeas petition could not have been sent with the fee.  Moreover, the docket in this matter does not reflect any filings, petition

or fee, until May 8, 2006 — too late for a timely filing for habeas relief.  *See*
respondent's Exh. E (Copy of docket in <u>Holmes v. Hulick</u>, 06-2090, United States
District Court for the Central District of Illinois).

In his second letter (#1-2, p. 1 of 2), dated May 1, 2006 (12 days *after* the
deadline for filing a timely habeas petition elapsed), petitioner acknowledged that he
still had not filed his habeas petition:

> I am writing to inform you it might be a few more days
> before I will be able to send you my habeas corpus petition
> because I am going to get copys [sic] of check to put in my
> file.  It will take some more time because it takes time to get
> call over to law library but soon as get copys [sic] *I will send
> habeas corpus petition and check.*

*See* letter, dated May 1, 2006 (emphasis added).  Petitioner clearly did not have his
petition and accompanying fee sent or on file by the deadline of April 19, 2006, as he
informed this Court on May 1, 2006, that each would be sent in a "few more days."

Moreover, petitioner sought leave to file in *forma pauperis*.  *See* application for
leave, as #1-1, pp. 1-2.  Logically, this application must have been filed *subsequent* to
the May 1, 2006 letter, or petitioner would have mentioned that in his letter.  The
application is court-stamped May 8, 2006, but because petitioner did not date or
notarize it, the actual date he signed it is not apparent from the document.

In sum, based on his admissions from his letter of May 1, 2006, petitioner had
not placed his habeas petition or accompanying filing fee with prison officials for
mailing by April 19, 2006, meaning his habeas petition is untimely.  Therefore,
petitioner's habeas petition was filed beyond the AEDPA's one-year limitation period.

11

Because petitioner did not file his petition for writ of habeas corpus within the limitation period set forth in 28 U.S.C. 2244(d)(1), this Court should dismiss it as untimely. Moreover, none of the exceptions of §2244(d)(1)(B)-(D), setting a later start date for limitations purposes, apply to petitioner. Accordingly, the instant petition should be dismissed with prejudice as time-barred.

Even if this Court rules that the petition was timely, for the reasons explained below, petitioner is still not entitled to relief.

### 2.    <u>Non-Cognizable Claim</u> – <u>Excessive sentence</u>

Petitioner's sixth claim for habeas relief — that the trial court improperly sentenced him to an excessive sentence of 115 years — is not cognizable for federal habeas relief as it does not describe a state court's violation of federal law. 28 U.S.C. § 2254(a); <u>Coleman v. Thompson</u>, 501 U.S. 722, 730 (1991); *see also* <u>Reed v. Clark</u>, 984 F.2d 209, 210 (7th Cir.), *aff'd*, 512 U.S. 1277 (1993). In order to be entitled to federal habeas relief, petitioner must establish that he is being held in violation of the constitution, laws or treaties of the United States. <u>Estelle v. McGuire</u>, 502 U.S. 62, 62 (1991); <u>Hass v. Abrahamson</u>, 910 F.2d 384, 389 (7th Cir. 1990); <u>Jones v. Thieret</u>, 846 F.2d 457, 459 (7th Cir. 1988). In other words, federal habeas review of state court convictions is limited to questions of custody in violation of federal law. <u>Coleman</u>, 501 U.S. at 730; <u>Reed</u>, 984 F.2d at 210. Petitioner's claim that his sentence was excessive does not describe a violation of federal law, and therefore, he is not entitled to relief on this claim.

Petitioner's sentencing claim is a state law issue which cannot be the subject of a federal habeas proceeding.  Lockyer v. Andrade,  538 U.S. 62, 73-77 (2003). Generally, if the trial court imposes a sentence within the range established by Illinois law, its severity is not grounds for habeas relief in federal court.  *See* Henry v. Page, 223 F.3d 477, 482 (7th Cir. 2000), *cert. denied*, 532 U.S. 979 (2001); Williams v. Duckworth, 738 F.2d 828, 831 (7th Cir. 1984); *see also* Rummel v. Estelle, 445 U.S. 263, 274-275 (1980); United States ex rel. King v. Cahill-Masching, 169 F.Supp.2d 849, 858 (N.D. Ill. 2001).

The appellate court, in denying petitioner relief on his excessive sentence claim, explained why his sentence was proper under Illinois law.  Petitioner was found guilty of three counts of home invasion, one count of armed violence and nine counts of aggravated criminal sexual assault, each involving different acts.  He was sentenced to 15-years' imprisonment for the armed violence conviction; 10-years' each for the aggravated criminal sexual assault convictions, to be served consecutively to each other and to the armed violence sentence; and a 10-year consecutive sentence for one of the home invasion convictions with a concurrent 15-year sentence for the other home invasion convictions, for an aggregate sentence of 115 years.  At the time of his sentence, a conviction under the armed violence statute entailed a minimum sentence of 15 years; a sentence for aggravated criminal sexual assault ranged from 6 to 30 years as a Class X felony with additional time mandatory depending on the circumstances of the assault (720 ILCS 5/12-14(d); 730 ILCS 5/5-8-1(a)(3).  In addition, petitioner's sentences were required to be imposed consecutively to each other (*see* 730

ILCS 5-8-4 (a)) and consecutive to the armed violence conviction. *See* #2-1, p. 52 of 53. Finally, the appellate court noted that a home invasion conviction was also a Class X felony, mandating a sentence ranging from 6 to 30 years with a longer sentence possible depending on the circumstances of the crime. Id. Defense counsel agreed that the absolute minimum sentence petitioner could have received was 69 years. Id.

As petitioner's total term of imprisonment fell within the proscribed statutory range, and the trial court did not abuse its discretion in imposing that sentence, his sixth claim for habeas relief — that he received an excess sentence for his convictions under Illinois law[5] — is not cognizable for habeas review.

### 3.    **Procedural Default**

A petitioner may seek federal habeas review only if he has exhausted all available state court remedies, and in the course of those proceedings, fully and fairly presented his constitutional claims to the state's courts. Farrell v. Lane, 939 F.2d 409, 410 (7th Cir.), *cert. denied*, 502 U.S. 944 (1991). *See* Harrison v. McBride, 428 F.3d 652, 661 (7th Cir. 2005) (petitioner must present both the operative facts and legal principles controlling each claim); Verdin v. O'Leary, 972 F.2d 1467, 1474 (7th Cir. 1992) (the procedural default inquiry focuses on whether the petitioner's federal claims were

---

[5] Petitioner received a sentence of 10 years' imprisonment upon being resentenced for the armed violence conviction, to be served consecutively with his previous convictions. As the appellate court pointed out, this sentence was *less* than what he received previously, making the aggregate of his sentences less as well. *See* #2-2, p. 10 of 26. As the previous aggregation of his sentences was not excessive, a reduction of that aggregation, still within the permissible range of Illinois law (*see* #2-2, p. 21 of 26), could not be excessive either.

14

fairly presented to the state courts).  A petitioner seeking habeas corpus relief is required to survive procedural default prior to any examination of the petition's merits. Coleman v. Thompson, 501 U.S. 722, 731 (1991).  The requirement that petitioner raise the claim in state court is grounded in the principle of comity; in a federal system the states should have the first opportunity to address and correct alleged violations of a state prisoner's federal rights.  Coleman, 501 U.S. at 731.

Procedural default generally occurs in either of two ways.  One involves a petitioner who, although diligently pursuing all appeals required under state law, nevertheless fails to raise the federal claims that he later attempts to assert as the bases for his federal habeas petition.  Wainwright v. Sykes, 433 U.S. 72, 87 (1977). In determining whether an issue has been fairly presented to a state court, the federal courts have looked to whether the petitioner's argument:  "(1) rel[ied] on pertinent federal cases; (2) rel[ied] on state cases applying constitutional analysis to a similar factual situation; (3) assert[ed] the claim in terms so particular as to call to mind a specific constitutional right; or (4) allege[d] a pattern of facts that is well within the mainstream of constitutional litigation." Verdin, 972 F.2d at 1473-74. "[T]he presence of any one of these factors ... does not automatically avoid a waiver; the court must consider the facts of each case." Id. at 1474.  To overcome procedural default, a petitioner must fully and fairly present each of his habeas corpus claims to the state courts, by setting forth the factual basis and the federal legal theory supporting the claim. Momient-El v. DeTella, 118 F.3d 535, 539, 541 (7th Cir.), cert. denied, 522 U.S. 984 (1997); Morrison v. Duckworth, 898 F.2d 1298, 1300 (7th Cir. 1990).  "Federal

15

judges will not presume that state judges are clairvoyant." Verdin, 972 F.2d at 1474; *see also* Baldwin v. Reese, 541 U.S. 27, 32 (2004); Harrison, 428 F.3d at 661; Sweeney v. Carter, 361 F.3d 327, 332 (7th Cir.), *cert. denied*, 543 U.S. 1020 (2004) (citing Verdin's four factors); Lockheart v. Hulick, 443 F.3d 927, 928 (7th Cir.2006) (claim must be articulated in way judge can grasp its substance and foundation in federal law; requirement not met if judge must go outside four corners of document to understand contention's nature and basis). The purpose of the rules of procedural default is to afford the state courts an opportunity to correct a constitutional violation. Duckworth v. Serrano, 454 U.S. 1, 2 (1981).

Procedural default also occurs when the state court declined to address a claim because the petitioner failed to comply with a state procedural requirement. Coleman at 729-730 (1991); Barksdale v. Lane, 957 F.2d 379, 382 (7th Cir), *cert. denied*, 506 U.S. 890 (1992). Where the failure results in the forfeiture of the petitioner's federal claims under a state law ground that is independent and adequate to support his conviction, he has procedurally defaulted the claim. Coleman, 501 U.S. at 730. Harris v. Reed, 489 U.S. 255, 264 (1989), announced a rule for determining when a procedural default under state law forecloses federal relief on collateral attack: if the State enforces its procedural rules and deems the claim forfeited, then federal review is barred; if the State excuses a default, then federal review is proper. Harris added that if the State's decision rests on both a procedural default and a lack of merit, then federal review is foreclosed, provided the finding of default is clear. Harris, 489 U.S. at 264 n.10; Fernandez v. Sternes, 227 F.3d 977, 981 (7th Cir. 2000). A state court has considered

16

a case on the merits "'unless the last state court rendering judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" Jefferson v. Welborn, 222 F.3d 286, 288 (7th Cir. 2000) (*quoting* Harris, 489 U.S. at 263).

Procedural default bars review absent a showing of cause for the default and actual prejudice resulting therefrom.   Gray v. Netherland, 518 U.S. 152, 161-66 (1996).  Petitioner can demonstrate cause "by showing that 'some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rules.'" United States ex rel. Taylor v. Barnett, 109 F.Supp.2d 911, 920 (N.D. Ill. 2000) (*quoting* Murray v. Carrier, 477 U.S. 478, 488 (1986)).  While counsel's failure to raise certain issues may fall within the cause and prejudice exception, (*see* Schlup v. Delo, 513 U.S. 298, 314 (1995)), federal courts may not engage in such analysis if state courts were not first presented with the issue.  Lemons v. O'Sullivan, 54 F.3d 357, 360 (7th Cir.), *cert. denied*, 516 U.S. 993 (1995) ("Before a state prisoner can use ineffective assistance of counsel as cause for procedural default, he must first present this claim as an independent claim to the state courts either on direct appeal or in a post-conviction proceeding.").

Alternatively, a petitioner can pursue his habeas claims if he can show that failure to consider them will result in a "fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  Under Schlup, a fundamental miscarriage of justice occurs when the petitioner can show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." 513 U.S. at 315, 327 (*quoting* Carrier, 477 U.S. at 496); *see also* House v. Bell, 547 U.S. __, 2006 WL 1584475, *13 (June 12,

17

2006). Accordingly, without new evidence of innocence, even a meritorious constitutional claim is not sufficient to allow a habeas court to reach the merits of a procedurally defaulted claim. United States ex rel. Bell v. Pierson, 267 F.3d 544, 551 (7th Cir. 2001), *cert. denied*, 535 U.S. 999 (2002) (*citing* Schlup, 513 U.S. at 316).

**Failure to raise claims in State Courts**.

Petitioner raises several issues that are procedurally defaulted. Petitioner acknowledges that his seventh (violation of due process when certain evidence was not presented at trial); eighth (testimony that contradicted petitioner's account was improperly admitted); and ninth (petitioner was made to go to trial with a biased jury since the jury had experienced acts that he was accused of) grounds for relief were never raised previously in any court. (Petitioner labels this section ("Grounds that were not presented in any court.")). *See* #2-1, p. 19 of 53. Failure to raise a claim during his direct and collateral appeals is a clear procedural default. Rodriguez v. Peters, 63 F.3d 546, 555 (7th Cir. 1995) (claims not raised in any state court proceeding cannot be raised for the first time in a federal *habeas corpus* petition); Burgin v. Broglin, 900 F.2d 990, 996-997 (7th Cir. 1990).

Further, petitioner offers no showing of cause or prejudice in his petition for failing to assert these issues in state court. Nor can he demonstrate a "fundamental miscarriage of justice," *i.e.*, that a constitutional violation has "probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 325-327, (1995); Mills v. Jordan, 979 F.2d 1273, 1277 (7th Cir. 1992). A review of the pertinent facts as detailed by the Illinois Appellate Court and unchallenged by petitioner shows

he cannot make a good-faith claim of actual innocence. *See* #2-1, pp. 25-35 of 53.

Defendant and codefendant Donte Lofton were tried together on 11 counts of aggravated criminal sexual assault, 4 counts of home invasion, 2 counts of armed robbery, and 1 count of armed violence. The charges stemmed from events that took place at two separate homes in the early morning hours of August 20, 1997. L.C. testified that she resides at 917 East Henderson in Decatur. She went to bed around 12:15 a.m. on August 20, 1997. She and her five-year-old daughter were in the house. She awoke to find defendant and Lofton in her bedroom. Defendant was wearing a blue bandanna on the lower part of his face and Lofton was wearing a ski mask. L.C. could see the outline of Lofton's braided hair through the ski mask. Defendant pulled her out of bed by her hair. He has a handgun. Lofton had previously visited L.C.s house. She knew him by the nicknames of "Tay" and "D-Money." She had never seen defendant.

The men stated they "wanted the money." She told them she did not have any money. Defendant pulled her by the hair into the living room, where she was forced to take off her clothes and lie on the floor. Lofton was going through her drawers at the time. Defendant held the gun to her head while she lay nude on the floor. He told L.C. that she was a "nasty bitch" and that she must be "horny" because her boyfriend was in jail.

Defendant placed the gun in her mouth and told her to lick it. She did as she was told. Lofton came into the living room, called her a "lying bitch," and told her he knew she had some money for her boyfriend's bond. She again said she had no money. Defendant began to "stomp" her in the head with his foot. She was still on the floor. The men again called her a "lying bitch" and said they would kill her daughter if she did not give them money. Lofton pulled out a screwdriver and handed it to defendant. He told defendant to "fuck that bitch." Defendant told her to spread her legs. He then "stuck" the screwdriver into her vagina for approximately a minute. Defendant pulled her by the hair back into her bedroom. Lofton continued to search her bedroom and the bathroom for money. When the search

19

ended, the men took her telephone, pager, and a box containing a Sony Play Station. She was dragged by her hair down the back stairs and told to lie down on the concrete stairs and pray, because they were going to shoot her in the back of the head. She started praying, and they told her to pray louder. They opened the door and ran out of the house. She heard car doors close and a car speed away. She did not see the car. She ran across the street to a neighbor's house and called the police.

L.C. testified that she identified defendant and Lofton in a police lineup after hearing them speak. She had scars on her head from the attack and suffered from "trauma headaches" for approximately three weeks. When she first talked to the police about what happened, she did not give them the perpetrators' names. She was very upset and did not look at a watch or clock during the incident or at the neighbor's house.

No latent fingerprints were found in L.C.'s house. Officers collected a telephone, green screwdriver, and hairbrush. Tire tracks were found in the alley behind L.C.'s house, but no castings were taken.

A.W. testified that on August 20, 1997, she lived at 2002 North Lowber in Decatur. Her sister, T.W., also lived at the house, along with T.W.'s four-year old daughter. T.J., A.W.'s boyfriend, lived at the house off and on. G.W., T.W.'s boyfriend, was in the house that night, along with two other children, M.W. and J.W. A.W, went to bed at 10:30 p.m. on August 19. About 12:30 or 1 a.m. on August 20, A.W. was awakened by the sound of the front door being kicked in. She did not actually look at the clock to see the exact time. She went downstairs and saw defendant with a handgun pointed at T.W.'s head. Lofton was also there. She had been introduced to Lofton and defendant the week before by her roommate, Amy Carney. A.W. dated defendant during a temporary breakup with T.J. Lofton's nicknames were "Tay" and "D-Money."

Defendant had a blue bandanna over his mouth and nose. Lofton was wearing a ski mask. A.W. could see his braided

20

hair sticking up under the mask. Defendant asked if anyone else was upstairs, and A.W. said T.J. was. Defendant took A.W. upstairs, pulling her by the hair, and holding the gun to her head. After A.W., T.J., and defendant were in the living room, Lofton ordered all the adults to take off their clothes. A.W. and T.W. were ordered to perform oral sex on each other simultaneously. A.W.'s mouth made contact with T.W.'s vagina and T.W.'s mouth made contact with A.W.'s vagina. This went on for approximately 10 minutes. At one point, one of the men hit A.W. on the head and told her she was not "doing it right." M.W. and J.W. were seated in the living room while this was taking place. Defendant sat in a chair about two feet away from A.W. and T.W., holding the gun.

One of the men then ordered T.J. to lick A.W.'s anus. T.J. complied and his mouth came in contact with her anus. Defendant stood right above them. Lofton called G.W. out of T.W.'s bedroom, and he was also ordered to take off his clothes. Lofton took T.W. into her bedroom. T.W.'s daughter was there. A.W. heard T.W. yell, "Not in front of my daughter, please." Still holding the gun, defendant told G.W. to lick A.W.'s vagina. His mouth came in contact with her vagina. Lofton brought T.W. back into the room, and she was ordered to perform oral sex on G.W. A.W. was ordered to perform oral sex on T.J. Her mouth made contact with T.J's penis. After this went on for five minutes, A.W. was hit in the head and told that she was not "doing it right." Defendant told T.W. she was not "doing it right" and hit her in the side of the head with the gun. T.W. was crying and saying, "Please. No."

A.W. testified that T.J. was ordered to perform oral sex on her and did so. G.W. was also ordered to perform oral sex on her and did so. Defendant and Lofton took $80 in cash from T.W., her pager, and A.W.'s pager. Before they left, the men forced all the adults to lie face down on the floor. They said that if anyone got off the floor or looked out the window, they would all die. A.W. did not see the men leave. After they left, the adults and children got into T.W.'s van and drove to Carney's house, as A.W.'s house had no phone. Carney had moved out of A.W.'s house of August 19, 1997. She was Lofton's former girlfriend. It was 1 a.m. when A.W.

21

looked at a clock at Amy's house. She and the other alleged victims were hysterical, crying, and shaking. G.W. was bleeding from the head and T.W. from the face. Although Carney did not want them to come in, A.W. pushed her way in and called the police. The group met officers at a nearby gas station. Later that morning, A.W. identified defendant and Lofton in a showup.

A.W. testified that two weeks prior to the incident, T.W. had a disagreement with defendant and Lofton. The men spent a considerable amount of time at A.W.'s house after they were first introduced to her. T.J. and defendant argued on one occasion when defendant was at A.W.'s house and T.J. came over uninvited.

T.W. testified that she was in bed with G.W. and her daughter when she heard the front door being kicked in. She looked at the clock and it was "right around" 1:30 a.m. When she went to the bedroom door, an intruder struck her in the face, held a gun to her head, and ordered her to strip. One intruder wore a ski mask, and the other wore a scarf over his mouth and nose. She recognized the men as defendant and Lofton. They had previously been social guests at the house, but T.W. had asked them to leave because she suspected them of stealing money from the table beside her bed. Lofton demanded money while she stripped. All the adults in the house were in the living room where they were ordered to perform oral sex on each other. Lofton forced T.W. into her bedroom and demanded money. Her daughter was awake on the bed. T.W. gave Lofton $80 from her coal pocket. Lofton told her to bend over the chair in her bedroom, and he inserted a curling iron in her vagina. T.W. asked Lofton not to do this in front of her daughter. Lofton said, "Shut up, bitch." T.W. was crying, and Lofton told her to stop being a baby and to quit crying. Lofton kept opening the curling iron while it was in her vagina. She asked him to stop because her daughter was watching. At some point, she began to bleed. After Lofton took her back to the living room, she was forced to perform oral sex on G.W.

T.W. stated she gave her pager to Lofton, and defendant took G.W.'s coat. During this time, defendant called Lofton

"D-Money." T.W. identified defendant as the perpetrators in a showup. She sought medical help at a hospital emergency room. She bled from her vagina for about two weeks after the incident. She had a small cut and bruises on her face and experienced swelling. Her ear canal was swollen from being hit on the side of her face.

T.W. testified that approximately two weeks before the incident, Carney had invited defendant and Lofton to the house. T.W. did not know who they were. She left to run an errand and when she returned, some money she had placed on her nightstand was gone. She told Carney about it and that defendant and Lofton would have to leave. Two nights before the incident, the men were again at the house with Carney and A.W. T.W. told both women that defendant and Lofton would have to leave. The reason the alleged victims went to Carney's house after the incident was to learn defendant's last name and Lofton's name. Carney had moved out on August 19 with no notice.

T.J. testified that defendant ordered G.W. to lick T.J.'s anus and he did so. Defendant stood over them while this was happening. Lofton was searching the house. T.J. saw Lofton stick a curling iron inside T.W. while she was lying on the floor in front of her bedroom door. Defendant hit T.J. in his face and side. Lofton picked up a can of spray starch and hit G.W. in the back of the head a couple of times. Blood gushed from his head. T.J. identified defendant and Lofton in a showup.

#2-1, pp. 25-31.

G.W.'s testimony was similar to that of the other alleged victims. He testified that when he was ordered to lick T.J.'s anus, his mouth did not come in contact with the anus; rather, his mouth made contact with "[t]he cheek of [T.J.'s] butt." G.W. identified defendant and Lofton by their clothing and shoes later that day in a showup.

#2-1, p. 33.

J.W. testified that he is seven years old. He testified as to the school he attended and his teacher's name. A.W. and

T.W. are his aunts.  He recalled that on the night of the
incident, T.W., A.W., G.W., T.J., and M.W. were at the
house.  He slept that night in a chair in the living room.
M.W. slept on the couch.  He was awakened by someone
kicking the door.  Two black men broke into the house.  The
shorter man had a gun.  They were saying "cuss words" and
"hit the floor."  One of the men got a can and threw it at
G.W.  It hit him on the head.  J.W. saw a white man waiting
outside for the black men.  One of the men called the other
"gee-money or something like that."  He saw the two black
men leave.  They "went around a circle," then got into a car.
The car was white with a dark black or dark red spot on the
car.  J.W. identified a photograph of a car that he said
defendant and Lofton got into after leaving.  The following
exchange occurred between the prosecutor and J.W.:

"Q.    Okay, where do you remember seeing spots on
the white car?

A.    When he pulled out of the driveway.

Q.    No; where on the car did you see spots?

A.    That one right there.

Q.    Okay.  Are you pointing to the back, [n]ear
the tail[]lights?

A.    Yes.

Q.    What color was that spot you saw on the
white car?

A.    I seen a dark red and dark black, that's
what I seen.

Q.    Is that the color you saw that morning?

A.    Yeah.


On cross examination, J.W. was asked what side of the car
he could see from the living room.  He said the car was in

24

the driveway and he could see the back of the car. He stated the car was backing out, and he saw the spot. He thinks the car was pulled head first into the driveway. J.W. saw a stop sign. The man driving the white car stopped, but the "cops got him." A.W. and T.W. called the police from the house, and the police arrested the men in front of the house.

*See* Exh. A, at app. A-9-10.[6]

Terry Balagna, the emergency room physician who treated T.W., testified that T.W. had a small abrasion and some bruising to the left side of her face. She had some abrasions and scrapes inside her mouth. She also had bruising and swelling on the outside of her vagina, as well as bruising and abrasions inside. Balagna also treated G.W., who had bruising and swelling on his left jaw area and a laceration about one-inch long on the back of his head. Five sutures were required to close the wound.

Police officer Sean Trent testified that he videotaped the crime scene at A.W.'s house. He found a shoe imprint near the doorknob on the outside of the front door. The area around the deadbolt lock had been pushed through and splintered. Blood appeared to be on the floor and one wall of the living room. Trent also found blood in T.W.'s bedroom, as well as a curling iron with a drop of blood on it. He also observed what appeared to be blood on a pair of white socks in the upstairs area. Trent also took each of the four adults separately to 434 Longview in Decatur, where they each identified defendant and Lofton as perpetrators. Trent testified that he did not seize the starch can he found, nor was the scene processed for fingerprints. The blood stains were not preserved.

#2-1, pp. 31.

Because petitioner never allowed Illinois courts to examine these claims, and does not

---

[6] Respondent cites Exh. A for J.W.'s testimony as petitioner failed to include page 9 of the appellate court's order of April 28, 2000 with his habeas petition.

claim he was actually innocent, the issues he failed to raise at any stage of the state curt proceedings are procedurally defaulted.

### 4. Merits

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) became law, and, accordingly, applies to petitioner's Section 2254 petition, which was filed on May 8, 2006. *See* Beneficial v. Davis, 357 F.3d 655, 659 (7th Cir. 2004), *cert. denied*, 543 U.S. 1084 (2005). The scope of federal review of state court judgments under the AEDPA is narrow. In passing the AEDPA, Congress "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002). Therefore, the "highly deferential standard" imposed by Section 2254(d)(1) "demands that state court decisions be given the benefit of the doubt," Woodford v. Visciotti, 537 U.S. 19, 24 (2002), and requires that this Court, to the greatest extent possible, respect the legal and factual dispositions made by the Illinois courts, even if it disagrees with them. Simple disagreement with a state court decision and the subsequent grant of habeas relief based on that disagreement improperly "exceeds the limits imposed on federal habeas review." Visciotti, 537 U.S. 20.

The AEDPA permits this Court to grant habeas corpus relief only if the petitioner shows that the state court's decision on the merits of a constitutional claim is either "contrary to" or employs an "unreasonable application of" United States Supreme Court precedent, or was premised on an unreasonable determination of facts.

28 U.S.C. §2254(d)(1-2).  A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law; [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the United States Supreme Court]." Williams, 529 U.S. at 405; *see also* Harding v. Sternes, 380 F.3d 1034, 1042-1043 (7th Cir. 2004), *cert. denied*, 543 U.S. 1174 (2005).  Stated differently, "a state court acts contrary to clearly established federal law if it applies a legal rule that contradicts [the Supreme Court's] prior holdings or if it reaches a different result from one of [the Supreme Court's] cases despite confronting indistinguishable facts." Ramdass v. Angelone, 530 U.S. 156, 165-166 (2000).  "Avoiding these pitfalls does not require citation of [Supreme Court] cases - indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 9 (2002) (emphasis in original).

With respect to the "unreasonable application" prong, the Court prescribed the following objective test:  "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 408.  The Court cautioned that "an unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

27

erroneously or incorrectly.  Rather, that application must also be unreasonable."
Williams, 529 U.S. at 411.  A petitioner cannot secure habeas relief unless, "under
clearly established federal law, the state court was unreasonable in refusing to extend
the governing legal principle to a context in which the principle should have
controlled."  Ramdass, 530 U.S. at 166.  The federal habeas scheme "leaves primary
responsibility to the state courts for these judgments, and authorizes federal-court
intervention only when a state-court decision is objectively unreasonable."  Visciotti,
537 U.S. at 27.  It is the petitioner's burden to show that the state court applied
Supreme Court precedent in an objectively unreasonable manner.  Visciotti, 537 U.S.
at 25; Harding, 380 F.3d at 1043.

Findings of fact made by the state courts are entitled to deference by the federal
courts.  Sumner v. Mata, 455 U.S. 591, 598 (1982) (*per curiam*).  Indeed, a state court
factual finding is "presumed to be correct," and petitioner bears the burden of rebutting
this presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).
Additionally, Section 2254(e)(1) does not require such findings to be based on
evidentiary hearings.  Mendiola v. Schomig, 224 F.3d 589, 592-593 (7th Cir. 2000), *cert.*
*denied*, 533 U.S. 949 (2001).  If the state court's finding is supported by the record,
even though not by a "hearing on the merits of [the] factual issue," then it is presumed
to be correct.  Id. _

_____

I.    **Claims from petitioner's direct appeal**

a.    **Petitioner's first claim - ineffective assistance of counsel**

Petitioner raises two arguments that trial counsel was ineffective.  He asserts that counsel was ineffective in failing to:  (a) object when the prosecutor used improper and inflammatory racial language during the trial;[7] and (b) request a competency hearing for witness J.W.  *See* #2-1, p. 8 of 53.  Petitioner's ineffective assistance of counsel claim should be denied.

The standard for reviewing an assertion of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  Under <u>Strickland</u>, a petitioner alleging ineffectiveness of counsel must show that: (a) counsel's performance was

---

[7] Petitioner fails to state in his petition what the prosecutor actually said, when he said it and how it allegedly affected his trial.  This Court could dismiss this claim on this ground alone.  *See* <u>United States ex rel. Jones v. Chrans</u>, 187 F.Supp.2d 993, 1007-1008 (N.D. Ill. 2002) (habeas court can deny unarticulated claim on the merits); *see also* Rule 2(c) of the Rules Governing Section 2254 Cases (petitioner bears burden to articulate legal and factual support for the asserted ground).

Additionally, petitioner provides neither this Court nor respondent with sufficient factual detail to review his claim.  A habeas petitioner <u>must</u> state specific facts fleshing out each ground for relief so that the district court may tell from the face of the petition whether further habeas review is warranted. <u>Adams v. Armontrout</u>, 897 F.2d 332, 334 (8th Cir. 1990) (*citing* Rule 2(c), Rules Governing Section 2254 Cases in the United States District Courts (1982) (emphasis added)). A habeas petitioner cannot stand on mere vague and cursory assertions of a constitutional violation. <u>Wacht v. Cardell</u>, 604 F.2d 1245, 1246-1247 (9th Cir. 1979); <u>Cunningham v. Estelle</u>, 536 F.2d 82, 83 (5th Cir. 1976). By failing to follow these requirements, petitioner has not met his burden under the AEDPA and is not entitled to relief on these claims for that reason. Without more information on this claim, respondent assumes this claim refers to the same claim petitioner raised in state court, and will answer it accordingly.  If he is referring to a different claim than the one made in state court, it is procedurally defaulted under <u>Rodriguez</u>, *infra*.

29

deficient; and (b) the deficient performance prejudiced the defendant.  Strickland,  466 U.S. at 687.

To satisfy Strickland's first prong, petitioner must demonstrate that his counsel's performance fell below an objective standard of reasonableness.   In reviewing challenged conduct, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  To satisfy the prejudice prong of the Strickland test, petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id.  This Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."  Strickland, 466 U.S. at 689. Rather, "[i]f it is easier to dispose of an ineffective assistance of counsel claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed."  Id.

Ineffective assistance of counsel is a mixed question of law and fact reviewable under §2254(d)(1).  Porter v. Gramley, 112 F.3d 1308, 1313 (7th Cir. 1997), cert. denied, 522 U.S. 1093 (1998).  Under this standard of review, a federal court will disturb only a state court's unreasonable application of Strickland.  This means that only a clear error in applying Strickland's standard will support a writ of habeas corpus.  Holman v. Gilmore, 126 F.3d 876, 882 (7th Cir. 1997), cert. denied, 512 U.S. 1150 (1998).

In Murrell v. Frank, 332 F.3d 1102, 1112 (7th Cir. 2003), the Seventh Circuit described the high level of deference accorded to state trial decisions on the issue, noting

30

that "in reviewing the state trial and appellate courts' adjudication of an ineffective assistance claim, we MUST *presume all factual determinations made by the state courts, including credibility determinations, are correct, unless rebutted by clear and convincing evidence*" (emphasis in original).  Further, in that context, <u>Murrell</u> reaffirmed that "'the criterion for assessing the reasonableness of a state court's application of Supreme Court case law, pursuant to §2254(d)(1), is whether the determination is at least minimally consistent with the facts and circumstances of the case.'" <u>Id</u>. *(quoting* <u>Sanchez v. Gilmore</u>, 189 F.3d 619, 623 (7th Cir. 1999), *cert. denied*, 529 U.S. 1089 (2000)).

As the Seventh Circuit held in <u>Woods v. McBride</u>, 430 F.3d 813 (7th Cir. 2005), counsel's performance is viewed deferentially, "with the understanding that there is a great deal of room for disagreement among reasonable attorneys as to the appropriate strategy or tactics to employ in the course of representation," so there is a strong presumption that counsel rendered reasonably effective assistance.  <u>Id</u>. at 821 (*citing* <u>Ashford v. Gilmore</u>, 167 F.3d 1130, 1134 (7th Cir. 1999), *cert. denied*, 529 U.S. 1086 (2000)).  The Court of Appeals further noted that a petitioner must show more than that his counsel made poor decisions; he must demonstrate that counsel's performance was so inadequate that it could not reasonably be said that counsel functioned as "counsel" in the manner required by the Sixth Amendment.  <u>Woods</u>, 430 F.3d at 821 (*citing* <u>Eddmonds v. Peters</u>, 93 F.3d 1307, 1313 (7th Cir. 1996), *cert. denied*, 520 U.S. 1172 (1997)).  Petitioner cannot meet this burden.

31

_____i.    __Failure to object to prosecutor's remarks__

Assuming petitioner is raising the same claim that he raised in state court, he first claims that counsel was ineffective because he failed to object when the prosecutor made improper racial remarks.[8]   Petitioner is not entitled to relief on this claim.

The Illinois appellate court listed the remarks relevant to petitioner's claim:

(1)    During the prosecutor's opening statement, he told the jury that some of the alleged victims were white and some were black;

(2)    During his examination of J.W., the prosecutor asked him how many people came into A.W.'s house.  J.W. said there were two.  The prosecutor then asked him whether the people were black or white.  J.W. stated they were black;

(3)    The prosecutor asked G.W. whether any children were in the house the night of the attack.  G.W. stated that a little boy was in a chair and a little girl was on the couch.  The prosecutor asked what "color" the children were.  G.W. replied that the boy was white and the girl was black;

(4)    During the cross-examination of [witness Candace] Dickens, the prosecutor asked if she recalled talking to Applegate on August 21, 1997.  Dickens asked who Applegate was.  The prosecutor replied he is a white detective;

(5)    In his closing argument, the prosecutor told the jury that the trial consisted of two separate criminal episodes.  The first was the attack on L.C. and the second was the attack at A.W.'s home.  The prosecutor expressed his belief that both attacks were carried out by the same two people.  In explaining his theory to the jury, the prosecutor noted that there were similarities between the two attacks.  He then explained in detail what those similarities were, stating in part:

---

[8] Petitioner does not raise a separate claim that he was denied a fair trial by the remarks of the prosecutor, perhaps because the appellate court found that issue forfeited when petitioner failed to include it in his post-trial motion.  _See_ #2-1, p. 40 of 53.  Accordingly, this claim would be defaulted under the independent and adequate state law doctrine.  Coleman v. Thompson, 501 U.S. 722, 729-32 (1991).

"And what are those similarities?  There were two black men.  The taller man in each each episode had a blue scarf or bandana on the lower parts of his face.  In each episode, the taller man was armed with a handgun.  In each episode, the shorter man had a ski mask on.  * * * There was forcible entry through the doors.  Women were pulled by the hair. Money was demanded at gunpoint.  All the adults present were ordered to strip.  Women were struck in the head.   And this is the most unusual characteristic of both crimes — the only sexual assaults personally performed by the perpetrators involved inserting an inanimate object into a women's vagina."

(6)    At another point in closing argument, the prosecutor stated that T.J. had "committed the unpardonable sin of dissing another young black male." This reference was to an argument T.J. had with defendant prior to the night of the attack; and

(7)    During closing argument, the prosecutor said:

"But the victims in this case aren't high[-] profile people.  The victims in this case probably aren't even middle class.  You saw videotapes of the houses in which they lived. The victims were black.  The victims were white.   The victims had criminal records. These victims weren't living the American dream.

The problem with justice in America has been, and often continues to be[,] that victims who get justice are often those who have wealth. Victims who get justice are often those who have a certain color of skin.  Those victims on the bottom of the socioeconomic ladder are often left to scrounge for the few morsels of justice scattered on the ground.  Although [the alleged victims] may have seemed like easy marks to [defendant and Lofton], people whom [defendant and Lofton] thought no jury would

33

> have an interest in, I submit that to them,
> justice is due."

#2-1, pp. 43-44 of 53.

The appellate court thoroughly examined the issue of whether the petitioner was prejudiced by the prosecution's remarks in its Order of April 28, 2000, and concluded that there was no prejudice. Without the requisite showing of prejudice, petitioner cannot prove ineffectiveness. *See* Taylor v. Bradley, __ F.3d __, 2006 WL 1376958 *7, n.8 (May 22, 2006) (Supreme Court "extremely perceptive" in making prejudice controlling prong of Strickland). The appellate court held that there was no reasonable probability that but for any of counsel's alleged errors, the result would have been different. *See* #2-1, p. 41 of 53. The court further held that the evidence presented to the trier of fact was not closely balanced, nor did any reference made by the prosecutor deprive petitioner of a fair trial. Id. at 44.

The appellate court first cited Illinois law for the proposition that while racial references should not be made during trial, not all such references require reversal. Id. (*citing* People v. Bramlett, 211 Ill.App.3d 172, 182, 569 N.E.2d 1139 (4th Dist. 1991)). The court explained that any such comments must be examined in their entirety and placed in context. Id. (*citing* People v. Campbell, 264 Ill.App.3d 712, 736, 636 N.E.2d 575 (1st Dist. 1992)).

———

34

Examining the comments about which petitioner complained,[9] the appellate court found no prejudice to petitioner.  The court ruled that a comment made during opening statement that some of the victims were white and some black was merely descriptive, which the jury was aware of when the victims testified, and the jurors had also been specifically instructed that opening statements were not evidence.  The court held that the reference to the perpetrators' race during the examination of a child, J.W., (*see infra*, at. 32), was properly made for identification purposes. *See* #2-1, p. 44 of 53.  A question to another witness about the race of J.W. and a young girl, while serving no valid purpose, was not found to have prejudiced petitioner, since the victims were of different races.  Id. at 44-45 of 53.  Finally, the appellate court held that the prosecution's comments during closing argument that both of the alleged perpetrators were black, were not improper, since they served to identify the alleged attackers.  Id. at 45-46 of 53. Another comment, relating a confrontation petitioner had, where the youth involved "committed the unpardonable sin of dissing another black male (the petitioner)," was found to merely suggest a motive for petitioner's subsequent attack on the youth and others.  Id. at 46 of 53.

In sum, the appellate court held that most of the comments petitioner complained about served a legitimate purpose, and that the jury was properly instructed regarding the fact that opening and closing statements were not evidence.  Id.  The court

---

[9]  Petitioner complained of comments during:  (a) opening statements; (b) examination of a child witnesses; (c) examination of an adult witness, and (d) closing statements.  *See* #2-1, p. 44 of 53.

reasonably concluded that petitioner was not denied a fair trial due to any of the comments, and accordingly, since he could not show prejudice, he could not show counsel was ineffective for failing to object to any of the aforementioned comments. Id.

Petitioner cannot demonstrate he is entitled to relief on this claim. Petitioner cannot meet his burden under the second prong of Strickland to demonstrate that had counsel objected, there was a reasonable probability that the result of his trial would have been different. *See* Darden v. Wainwright, 477 U.S. 168, 181 (1986) (unless prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process, petitioner not entitled to relief); Bartlett v. Battaglia, 2006 WL 1686751, No. 05-1715, * 10 (June 21, 2006) (finding no due process violation under Darden); Hough v. Anderson, 272 F.3d 878, 904 (7th Cir. 2004) (employing Darden, and noting that the weight of the evidence as "the most important consideration" to consider regarding whether comments violated due process); Swofford v. Dobucki, 137 F.3d 442, 446 (7th Cir. 1998) (no ineffectiveness where counsel failed to object during prosecutor's closing argument in aggravated sexual assault prosecution because the jury made the entirely reasonable finding that petitioner perpetrated the charged crime). Petitioner is not entitled to relief on his first ineffective assistance of counsel assertion.

### ii.    **Failure to seek a competency hearing**

Petitioner's next alleges he received ineffective assistance because his lawyer did not request a competency hearing for witness J.W., who was seven-years old. #2-1, p.

8 of 53.[10]    Petitioner is not entitled to relief on this claim since the appellate court's holding was proper and not contrary to, or an unreasonable application of, Supreme Court precedent.

In reviewing this claim, the appellate court found no ineffectiveness.  Petitioner argued J.W. had been incompetent to testify due to his "self-contradictory and 'demonstrably false'" testimony.  Id. at 46 of 53.  The court first cited 725 ILCS 5/115-14 which set forth the requirement for the determination of a witness' competency.[11] Regarding a child's testimony, the court explained that the intelligence of the child, rather than his chronological age, determined the child's competency as a witness.  Id. at 47 of 53 (*citing* People v. Ridgeway, 194 Ill.App.3d 881, 884, 551 N.E.2d 790 (4th Dist. 1990).  Further, the court noted that if a witness "is sufficiently mature to receive correct impressions by his senses, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, he is competent" to testify.  Id. (*citing* People

---

[10] Petitioner does not explain why he believes that J.W.'s competence was an issue or how the failure to seek such a hearing prejudiced him.

[11] At the time of petitioner's trial, 725 ILCS 5/115-14 stated:

(a)  Every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter, except as provided in subsection (b).

(b)  A person is disqualified to be a witness if he or she is:

(1)  Incapable of expressing himself or herself concerning the matter so as to understood, either directly or through interpretation by one who can understand him or her; or

(2)  Incapable of understanding the duty of a witness to tell the truth.

(c)  A party may move the court prior to a witness' testimony being received in evidence, requesting that the court make a determination if the witness is competent to testify.  The hearing shall be conducted outside the presence of the jury and the burden of proof shall be on the moving party.

v. Davis, 10 Ill.2d 430, 436, 140 N.E.2d 675 (1957).

The appellate court noted that J.W. accurately answered questions asked of him regarding his age, schoolteacher, and relationship to A.W. and T.W. (other victims). #2-1, p. 48 of 53. The court further found that J.W.'s description of the two men who broke into his house was consistent with those given by adult victims. Id. J.W. also accurately described a car involved, but was confused about the location of the car and about evidence recovered from the car. Id. J.W. was also uncertain about where the attackers were apprehended. Id. However, the court noted that inconsistencies alone did not render J.W. incompetent to testify since his testimony was not so "fantastical" or so "lacking any basis in the truth" that it should been rejected. Id. The court reasonably concluded that since J.W. was not incompetent to testify, petitioner's attorney was not ineffective for failing to seek a competency hearing. Id.

Petitioner cannot show that the court's holding was premised on an unreasonable determination of facts, and the appellate court's holding that J.W. was not incompetent, petitioner's lawyer was not ineffective for failing to request a hearing on the issue was neither contrary to, nor an unreasonable application of Supreme Court precedent. *See* United States v. Boyles, 57 F.3d 535, 545-547 (7th Cir. 1995) (a court need only conduct a competency hearing if there are "compelling reasons" on the record, other than the child's age alone to suggest that the child is incompetent to testify (*citing* 18 U.S.C. § 3509(c)(4)); Webster v. Payton, 294 F.Supp. 1359, 1361-1362 (E.D. Va. 1968) (Competency of minor witness in state court prosecution is not matter reviewable by writ of habeas corpus in federal court). *Cf.* United States v. Gutman, 725 F.2d 417, 420

(7th Cir. 1984) (trial court's determination to hold hearing as to whether witness is competent to testify will not be reversed unless Circuit Court has clear conviction that [district court] erred).

In sum, petitioner fails to point to any evidence that J.W. was incompetent, nor does he explain why counsel's failure to seek a competency hearing prejudiced him or that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. This Court should deny petitioner's ineffectiveness claim as wholly without merit.

### B.    Petitioner's fourth claim - elicitation of petitioner's right to silence

Petitioner next claims that reversible error occurred when the prosecutor elicited petitioner's assertion of his right to silence from witness.[12]  Petitioner is not entitled to relief on this claim as he has not shown that the appellate court's adjudication of the question was contrary to or an unreasonable application of Supreme Court precedent.

In the appellate court, petitioner claimed that his constitutional right to silence was violated during the trial testimony of a police officer who had interviewed petitioner at the police station, after he was taken into custody. The officer had given petitioner his Miranda warning (Miranda v. Arizona,384 U.S. 436 (1966)), and petitioner agreed to talk. #2-1, at 32. The prosecutor asked the officer "[I]s that the complete interview

---

[12] Petitioner goes into no detail about this claim and does not say what the prosecutor actually did or at what stage of the proceedings his right to silence was improperly elicited. Respondent assumes that petitioner's contention is the same one that he made in the state court, as a different claim would be procedurally defaulted.

you had with [petitioner]?"  #2-1, p. 40 of 53.   The officer replied, "[A]t the time he asked for an attorney and then I took him to the Macon County jail," despite the question only calling for a yes or no answer.  Id. at 40 of 53.  Petitioner objected, but the court overruled the objection.  Id. at 33 of 53.  The appellate court called the answer non-responsive, but also noted that the prosecution did not refer to the statement in its closing argument, nor used it to impeach petitioner, and concluded that any error regarding the elicitation of petitioner's right to silence was harmless since the evidence of his guilt was overwhelming.  Id. at 40 of 53.

The appellate court's decision was reasonable.  While citing the United Supreme Court's decision in Doyle v. Ohio, 426 U.S. 610, 619 (1976) (use of defendant's postarrest silence for impeachment purposes violates due process) (cited at #2-1, p. 38 at 53), the court noted that the rule was not absolute.  The court pointed out that in People v. Lucas, 132 Ill.2d 399, 548 N.E.2d 1003 (1989), the Illinois Supreme Court  had held in a similar circumstance, that the rule from Doyle applied to references in testimony to a defendant requesting a lawyer following his arrest and Miranda warnings. #2-1, p. 39 at 53 (citing Lucas, 132 Ill.2d at 432-433).  The supreme court found that reference to Lucas' request for a lawyer did not constitute error, since the reference was not elicited by the prosecution, but volunteered by the witness.   Id.  Immediately after the statement was made, the trial court sustained Lucas' counsel's objection and the witness was instructed to make no more references to Lucas requesting an attorney. Id.  The supreme court further found that the prosecutor made no attempt to use Lucas' request to impeach him and did not argue it as evidence.  Id.  Finally, the supreme court

40

held that the evidence of Lucas' guilt was "overwhelming." #2-1, p. 39-40 at 53 (*citing* Lucas, 132 Ill.2d at 432-433).

Here, the appellate court noted that each consideration that the Illinois Supreme Court weighed in Lucas was present in petitioner's case and similarly concluded his due process rights had not been violated. This holding upsets no Supreme Court precedent. The actions of the prosecution during closing argument did not violate petitioner's due process rights. *See* Bieghler v. McBride, 389 F.3d 701, 705 (7th Cir. 2004) (No error where the prosecutor did not equate petitioner's silence with guilt, the evil condemned in Doyle*);* Splunge v. Parke, 160 F.3d 369, 371 (7th Cir. 1998) (Doyle stands for proposition that arrest-time silence not be used to impeach trial-time testimony by asking something like: "If the version of events to which you have just testified is true, why didn't you tell this to the police as soon as you were arrested?"). As the Seventh Circuit pointed out in Bieghler, where the prosecution's questions and argument regarding petitioner's post-arrest conduct were not aimed at impeaching petitioner's trial testimony, no due process error occurred. Bieghler, 389 F.3d at 707.

As the Illinois Appellate Court held that the prosecution neither referred to the statement in its closing argument, nor used it to impeach petitioner, petitioner's due process rights were not violated. Indeed, petitioner's brief, one-sentence mention of this claim does not show that the appellate court's decision was unreasonable or contrary to existing Supreme Court law. Petitioner is not entitled to relief on his fourth ground for habeas relief.

**C.**    **Petitioner's fifth claim - reasonable doubt**.

Petitioner's final claim from his direct appeal is that the State did not prove his guilt beyond a reasonable doubt regarding Count XIII (aggravated criminal sexual assault of T.J.).  Petitioner is not entitled to relief on this claim.

Petitioner argued in state court that the State had not met its burden since T.J. testified that G.W.'s mouth had not made contact with T.J.'s anus and that sexual penetration is established when it is proved beyond a reasonable doubt that one person's mouth makes contact, however slight, with another person's anus. #2-1, p. 48 of 53 (*citing* 720 ILCS 5/12-12(f)).  The appellate court disagreed.  Citing Illinois precedent (which had cited the United State Supreme Court's seminal case of <u>Jackson v. Virginia</u>, 443 U.S. 307, 318 (1979)), the court denied relief.

Reviewing the evidence, the appellate court found that while G.W. testified that he did not touch T.J.'s anus, T.J. testified that G.W. had "licked" his anus.  #2-1, p. 49 of 53.[13]   Holding that this was merely a question of the credibility of witnesses, the court cited the Illinois Supreme Court's decision in <u>People v. Bull</u>, 85 Ill.2d 179, 204, 705 N.E.2d 824 (1998) for the proposition that determinations of the credibility of witnesses, the weight given to their testimony, and inferences to be drawn therefrom lie within the province of the jury.  #2-1, p. 49 of 53.  Further, the appellate court held that a reviewing court would not overturn a jury's verdict if the evidence is merely conflicting, since the testimony of a single witness, including the victim is enough to

---

[13] T.J. also testified that petitioner had ordered G.W. to lick his anus. #2-1, pp. 30-31 of 53.

42

convict.  Id.  (*citing* People v. Brink, 294 Ill.App.3d 295, 300, 690 N.E.2d 136 (4th Dist.

1998)).  The appellate court concluded that the jury had found the testimony of T.J. to

be more credible than that of G.W. and that there was sufficient evidence for the trier

of fact to find petitioner guilty beyond a reasonable doubt of the aggravated criminal

sexual assault of T.W.  #2-1, p. 49 of 53.

The Illinois Appellate Court's decision was neither contrary to nor an

unreasonable application of clearly established Supreme Court precedent under Section

2254(d)(1).  Under Jackson, the relevant inquiry is:  "whether, after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt."  Jackson,

443 U.S. at 319. (Emphasis in original). In applying Jackson, deference is given to the

trier of fact and thus, reviewing courts may not substitute their judgment's for those of

the trier of fact, or reweigh the evidence.  Ford v. Ahitow, 104 F.3d 926, 935 (7th Cir.

1997).

In essence, petitioner seems to be asserting that the trier of fact was in error in

viewing T.J. a more credible witness than G.W.  The conflicting testimony was properly

considered by the trier of fact, and appropriately resolved.  Petitioner is really asking

that this Court review the evidence and overturn the fact-finder's determination of

witness credibility.  However, a federal habeas court may not do so.  *See* Marshall v.

Lonberger, 459 U.S. 422, 434 (1983) (federal courts are not given license to redetermine

credibility of witnesses whose demeanor has been observed by state court); Kines v.

Godinez, 7 F.3d 674, 678 (7th Cir. 1993), *cert. denied,* 510 U.S. 1200 (1994) ("federal

43

courts are in no position to re-determine the credibility of witnesses observed by state trial courts"). Nothing has changed since those determinations were made in state court, so all petitioner is doing is asking this Court to substitute its judgment for that of the state courts. This Court should decline petitioner's invitation to do this. Accordingly, petitioner is not entitled to relief from his fifth ground for habeas relief.

## II.     Claims from petitioner's collateral appeal

### a.     Petitioner's second claim - Improper imposition of consecutive sentences based on factors not proven to the jury

Petitioner's second claim asserts that "[T]he trial court erred when the court imposed consecutive sentences based on factors that was [sic] proven by a jury beyond a reasonable doubt," a claim apparently related to the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000). *See* petition at # 2-1, p. 9 of 53. Petitioner is not entitled to relief on this claim.

Although petitioner does not cite Apprendi in his petition, his contention in this regard amounts to an assertion that his sentence violated the rule of that case. Indeed, petitioner acknowledges that his second claim was made in his post-conviction petition (Id. at p. 10, par. (d)(1)), and the appellate court, when reviewing the denial of postconviction relief, appropriately characterized it as an Apprendi claim. That court noted that the *only* issue petitioner raised in his post-conviction petition was an Apprendi claim: "[I]n December on 2000, defendant filed a postconviction petition, alleging only that his consecutive sentences violated Apprendi v. New Jersey." (Citations omitted). *See* #2-2, p. 3 of 26. As petitioner makes no argument in support

44

of this claim, respondent assumes that it is the same claim raised in his PC petition —
that his consecutive sentences violated <u>Apprendi</u>.[14]

The appellate court rejected petitioner's claim.  After his appellate counsel filed
a motion to withdraw under <u>Pennsylvania v. Finley</u>, 481 U.S. 551 (1987), asserting no
issues of arguable merit existed because of the Illinois Supreme Court's decision in
<u>People v. Wagener</u>, 196 Ill.2d 269, 283-86, 752 N.E.2d 430 (2001) (<u>Apprendi</u> not
applicable to imposition of consecutive sentences), petitioner filed a motion in opposition
arguing that consecutive sentences are not readily distinguishable from extended-term
sentences, which could violate <u>Apprendi</u>.  *See* #2-2, p. 4 of 26.  Petitioner reasoned that
consecutive sentences imposed for offenses committed during a single course of conduct
in which no severe bodily conduct was inflicted constituted double punishment, which
he claimed <u>Apprendi</u> forbid.  <u>Id</u>.

After reviewing the record, the <u>Finley</u> motion, and petitioner's response, the
appellate court affirmed the trial court and granted the <u>Finley</u> motion.  <u>Id</u>.  The court
noted that the Illinois Supreme Court's decision in <u>Wagener</u> was binding precedent and
the court had no authority to disregard it.  <u>Id</u>. at p. 4-5 of 26.

Notwithstanding <u>Wagener's</u> holding, the appellate court also discussed
petitioner's claim that consecutive sentences were not distinguishable from extended-
term sentences and that <u>Wagener</u> was not binding because it contradicted a previous
supreme court case, <u>People v. King</u>, 66 Ill.2d 551, 363 N.E.2d 838 (1977).  Petitioner

---

[14] Indeed, if petitioner were making a different argument in his habeas petition,
it would be procedurally defaulted.

claimed <u>King</u> stood for the proposition that prejudicial double punishment occurs when consecutive sentences are imposed for crimes arising from multiple acts motivated by the same criminal objective. #2-2, p. 5 at 26.  The court found petitioner's argument without merit.

The appellate court initially found that the Illinois Supreme Court in <u>King</u> was referring to a statutory scheme that did not exist at the time of petitioner's conviction, and under the sentencing law to which petitioner was subject, consecutive sentences were  mandated for his sentences from the armed violence and each of the aggravated criminal sexual assault convictions.  <u>Id</u>.  Moreover, as the court further noted, the supreme court's passing observation in <u>King</u>, was not its holding, as <u>King</u> actually stood for the proposition that a defendant may not be convicted of more than one criminal offense carved from the same physical act and, where multiple acts are committed, multiple convictions are improper only if they are for included offenses.  <u>Id</u>.  The court held that <u>King</u> had no application to petitioner's case since his convictions were each based on different acts; therefore, its holding was not in conflict with <u>Wagener</u>; and that decision — that <u>Apprendi</u> did not apply to consecutive sentences —  controlled petitioner's case.  <u>Id</u>. at 5 and 6.

The appellate court's decision violates no Supreme Court holding.  Indeed, consecutive sentences have not been found to run afoul of <u>Apprendi</u>.  *See* <u>United States v. Noble</u>, 299 F.3d 907, 909 (7th Cir. 2002) (*rev'd on other grounds)* ( No error in imposing a combined sentence of 30 years); <u>United States v. Knox</u>, 287 F.3d 667, 669 (7th Cir. 2002).

46

The appellate court's decision was reasonable and was not contrary to United States Supreme Court precedent. Accordingly, petitioner is not entitled to relief on this claim.

### b.    Petitioner's third claim - Void sentence

Petitioner's final claim for relief is that his "consecutive sentence totaling 110 years are void, and must be modified to a total not exceeding sixty years, the maximum authorized by law." #2-1, p. 11 of 53. Petitioner is not entitled to relief on this claim.

Petitioner notes that this argument was made during his post-conviction proceedings and refers to the docket entry of the Circuit Court of Macon County from January 29, 2003, which he included in his petition. #2-2, p. 8 of 26. Indeed, the circuit court denied post-conviction relief on this claim, stating:

> Collateral Attack Upon a Void Judgment pursuant to 735 ILCS 5/2-140 (f) examined. Finding that Petitioner has misconstrued 730 ILCS 5/5-8-4 (c)(2) and 5/5-8-2. The maximum aggregate term authorized under 5/5-8-4 (c)(2) is the aggregate of the maximum extended terms authorized for the two most serious felonies involved. Defendant does not have to be eligible for an extended term on any of the individual charges for the aggregate maximum to apply. The most serious charges in this case are Class X offenses. The maximum allowable term would be 120 years. The aggregate sentences imposed are below that maximum.
>
> The Collateral Attack is denied, as is the Motion for Appointment of Counsel.

Id. Petitioner did raise this issue before the appellate court, but did so in his appeal from resentencing, which was actually a direct appeal. # 2-2, p. 9 of 26. Because this issue was raised before the appellate court and in his PLA, it is therefore preserved for

47

review. [15]

The appellate court examined petitioner's sentencing claim in its April 19, 2004 opinion. Petitioner asserted that because the trial court had not made specific findings of aggravation, the maximum term he was eligible for was 60 years. #2-2, p. 12 of 26. The appellate court disagreed, and held that petitioner did not have to be eligible for an extended term for the extended-term maximum sentence to apply, as the trial court was within its discretion to impose a sentence up to 120 years. Id.

In explaining its decision, the appellate court first noted that at the time of petitioner's offenses, 730 ILCS 5/5-8-4(c)(2) stated that "the aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under [s]ection 5-8-2 for the [two] most serious felonies involved." Id. at 13.[16] The court interpreted 5-8-2, as referenced by 5-8-4(c)(2), as a limitation or cap on the maximum aggregate sentence of up to 60 years for a Class X felony. Id. Therefore, as petitioner's two most serious offenses were Class X felonies, the court concluded, under 5-8-4(c)(2), the trial court was authorized to impose an aggregate sentence not to exceed 120 years. Id. Petitioner's ultimate sentence of 110 years did not exceed this amount, and in fact, was

---

[15] However, because petitioner's claim involves an interpretation of whether the length of his sentence was proper or void under Illinois law, this Court should find it non-cognizable for the reasons articulated *infra*. at 15-17.

[16] 730 ILCS 5/5-8-2(a) provided in relevant part: that "[a] judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by [s]ection 5-8-1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of [s]ection 5-5-3.2 were found to be present."

48

less than the maximum.  The court further explained that because aggravating factors need only be found where a trial court wants to impose an extended-term sentence, petitioner's sentence would be excessive only if had received either an extended-term sentence or an aggregate sentence in excess of 120 years.  Id. at 14 of 26.  Neither circumstance was present, and petitioner was properly sentenced within the applicable sentencing range since the trial court did not have to consider factors in aggravation. The court further noted that the trial court was not free to impose *any* sentence on petitioner; it was constrained to impose sentences the aggregate of which did not exceed the maximum terms authorized under 5-8-2 for the two most serious felonies.  Id. (*citing* People v. Tucker, 167 Ill.2d 431, 438-439, 657 N.E.2d 1009 (1995)) (defendant may not be sentenced to consecutive sentences *that exceed* the sum of the maximum extended terms authorized for the two most serious felonies involved, whether those felonies are part of the same or separate concurrences).  As the maximum sentences for the two most serious felonies were 60 years, an aggregate sentence of 110 years did not exceed the supreme court's rules as articulated in Tucker.  #2-1, 21 of 26 (*citing* Tucker, 167 Ill.2d at 439).

Noting that petitioner received all Class X convictions, the appellate court concluded that because the trial court relied only on that portion of the extended-term statute (5-8-4(c)(2)) to determine the maximum aggregate consecutive sentence to impose, petitioner's sentence was proper since it was neither based upon an extended-term sentence nor any aggravating factors.  Id. at 21.   Because petitioner received consecutive sentences under 5-8-4 (c)(2), the court could not impose an aggregate

49

sentence of greater than 120 years, the maximum allowable for the two most serious offenses.  After resentencing, the aggregate total of petitioner's sentence was 110 years, within the permissible range.  Id.  Accordingly, petitioner's sentence was proper, and he is not entitled to habeas relief on this claim.

## Conclusion

WHEREFORE, based on the foregoing, respondent requests that this Court dismiss the petition for writ of habeas corpus with prejudice as petitioner is time-barred from seeking federal habeas relief.  In the alternative, this Court should deny the instant petition for the reasons stated in respondent's answer.  If this Court finds that any of the issues respondent contends are non-cognizable or procedurally defaulted either cognizable or not defaulted, respondent requests a further opportunity to answer those claims on their merits.

Respectfully submitted

LISA MADIGAN
Attorney General of Illinois


BY    s/Russell K. Benton_____
       RUSSELL K.  BENTON
       100 West Randolph Street
       12th Floor
       Chicago, Illinois 60601
       (312) 814-2113
       FAX (312) 814-5166
       E-Mail: Rbenton@atg.state.il.us
       Att.Reg.No: 6203142

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>GREIGORY HOLMES,<br><br>Petitioner,<br><br>vs.<br><br>DONALD HULICK, Warden,<br><br>Respondent. | )<br>)<br>)<br>)<br>)  No.  06 C 2090<br>)<br>)  The Honorable<br>)  Harold A. Baker,<br>)  Judge Presiding.<br>) |

---

### TO THE CLERK OF THE UNITED STATES DISTRICT COURT

Pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States

District Courts, the following exhibits are hereby filed in the above-captioned matter

to supplement the materials petitioner included with his petition:

        Exhibit A:    PLA in <u>People v. Holmes</u>, No. 71191;

        Exhibit B:    Order of the United States Court, denying petitioner's
                       petition for *certiorari*, <u>Holmes v. Illinois</u>, No. 00-6443,
                       filed December 4, 2000;

        Exhibit C:    PLA in <u>People v. Holmes</u>, No. 98477;

        Exhibit D:    Order of the United States Court, denying petitioner's
                       petition for *certiorari*, <u>Holmes v. Illinois</u>, No.03-9587,
                       filed June 1, 2004; and

        Exhibit E:    Copy of docket sheet in <u>Holmes  v. Hulick</u>, 06-2090,
                       United States District Court for the Central District
                       of Illinois).

BY:    s/Russell K. Benton_____
RUSSELL K.  BENTON
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2113
FAX (312) 814-5166
E-Mail: Rbenton@atg.state.il.us
Att.Reg.No: 6203142

NO.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, No. 4-98-0768. |
| Plaintiff-Respondent, | ) ) | |
| | ) ) | There on appeal from the Circuit Court of the Sixth Judicial Circuit, |
| vs. | ) ) | Macon County, Illinois, No. 97-CF-1130. |
| | ) | |
| GREGORY HOLMES, | ) ) | Honorable John L. Davis, |
| Defendant-Petitioner. | ) | Judge Presiding. |

**PETITION FOR LEAVE TO APPEAL**

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth Street, Suite 102
P.O. Box 5750
Springfield, IL  62705-5750
(217) 782-3654

CATHERINE K. HART
Assistant Defender

COUNSEL FOR DEFENDANT-PETITIONER

EXHIBIT A 1

NO.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF<br>ILLINOIS, | ) <br> ) <br> ) | Appeal from the<br>Appellate Court of Illinois,<br>Fourth Judicial District, |
| Plaintiff-Respondent, | ) | No. 4-98-0768. |
| | ) | |
| | ) <br> ) | There on appeal from the<br>Circuit Court of the |
| vs. | ) <br> ) <br> ) | Sixth Judicial Circuit,<br>Macon County, Illinois,<br>No. 97-CF-1130, |
| GREGORY HOLMES, | ) <br> ) | Honorable John L. Davis |
| Defendant-Petitioner. | ) | Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE
STATE OF ILLINOIS:

May It Please The Court:

## I.

## PRAYER FOR LEAVE TO APPEAL

Now comes the defendant-petitioner, Gregory Holmes and respectfully petitions this Court

pursuant to Illinois Supreme Court Rules 315 and 612(b) for leave to appeal from the judgment of

the Illinois Appellate Court, Fourth Judicial District.

## II.

## STATUS OF THE CASE

On December 23, 1997, Gregory Holmes was convicted of three counts of home invasion,

one count of armed violence, and nine counts of aggravated criminal sexual assault. (Vol. II, R. 16-33;

Vol. VI, R. 532-536)  On September 3, 1998, the defendant was sentenced to a total of 115 years

imprisonment.  (Vol. VIII, R. 41-42)

## IV.

## FACTS NECESSARY FOR AN UNDERSTANDING OF THE CASE

On August 19, 1997, Lisa Creason was assaulted and robbed in her home by two men. (Vol. IV, R. 47-50, 52, 58, 61) The following day, Lisa went to the police station and identified the men as Donte Lofton and Gregory Holmes. (Vol. IV, R. 62-63) On August 20, 1997, Angela Webb, Tammy Webb, Gary Wade, Tywuan Jones, and Tammy's four year old daughter Brittany, were asleep at 2002 North Lowber Street. (Vol. IV, R. 81-82) Also present that night were Michea Witherspoon, Tammy's 12 year old goddaughter, and Jonathon Lilly-Webb – Tammy and Angela's nephew, who was six or seven. (Vol. IV, R. 84, 132) Two men, later identified as Gregory Holmes and Donte Lofton, broke into the house and herded all of the occupants, except Brittany who was in the downstairs bedroom, into the living room. (Vol. IV, R. 85-88, 90-91, 133-134, 140)

Donte instructed everyone to strip nude and Angela and Tammy were ordered to perform oral sex on each other. Then Tywuan was ordered to lick Angela's anus. (Vol. IV, R. 92, 138, 94, 172-174) Tammy was taken back into her downstairs bedroom. (Vol. IV, R. 140) Donte told Tammy to bend over the chair and inserted a curling iron into Tammy's vagina. (Vol. IV, R. 141- 143) While Tammy and Donte were in the bedroom, Gary was instructed to lick Angela's vagina. Angela was ordered to perform oral sex on Tywuan. (Vol. IV, R. 96-98, 100) Gregory ordered Gary to lick Tywuan's anus. Gary testified that he never made contact with Tywuan's anus, but Tywuan testified that Gary licked his anus. (Vol. V, R. 265-266) (Vol. IV, R. 172-174) Gregory kicked Tywuan in the head and Tywuan saw Donte hit Gary over the head with a starch can. (Vol. IV, R. 185, R. 266-268) Approximately $80.00 in cash, a coat and two pagers were taken. (Vol. IV, R. 102-103)

When Gregory and Donte left, everyone got into a van and drove to Amy Carney's house. (Vol. IV, R. 103-104, R. 146, 148-149) When they arrived at Amy's they called the police and met them at a gas station down the street. (Vol. IV, R. 106) Officer Sean Trent, a police officer with the City of Decatur, was detailed by dispatch at 2:07 a.m. to the Speedway gas station to meet the Webb group. (Vol. IV, R. 196-198) Officer Trent transported each of the four victims to 434 Longview

- 3 -

Latoya Jones testified that she and Gregory Holmes have three kids together and she has known him 4½ years. On August 19, 1997, Latoya arrived home around six or seven p.m., Gregory was present at 434 Longview when she arrived. At approximately 8:00 p.m., Latoya answered the door and Donte was there. (Vol. V, R. 379-381) At approximately 8:30 p.m., Donte and Gregory left 434 Longview by foot. They returned to 434 around 9 or 10 p.m. After Candace, Bernice and Doris arrived they left again with Donte at about 11:00 p.m. They were gone approximately 30 minutes. (Vol. V, R. 382-384)

Around 1:00 a.m., Candace, Bernice and Doris left Latoya's house. At that time, Gregory and Donte were in the living room watching television. A few minutes after she left, Doris returned to do Latoya's hair. Doris worked on Latoya's hair for about thirty minutes putting finger waves in. Then Latoya started making tacos for Gregory and Donte. (Vol. V, R. 385-387) Doris left when Latoya started making tacos for the men. Gregory was cutting up tomatoes when the Longview police arrived. The Decatur police arrived between 10 to 30 minutes later. (Vol. V, R. 388-390) Latoya told the police that Gregory had arrived at her apartment at 11:30 p.m. on the 19th and had not left. (Vol. V, R. 399) Officer Aukamp testified that Latoya Jones told him that Gregory Holmes had been at her house since August 18, 1997, and had not left. Aukamp's interview with Latoya was fairly brief, five maybe six minutes. (Vol. VI, R. 441, 443) Latoya was not sure how much time passed between when Doris left and the police showed up. (Vol. V, R. 403)

During the State's closing argument, the prosecutor made several references to race. (Vol. VI, R. 443)

On December 23, 1997, the jury came back with verdicts of guilty as to the following counts: Count II – home invasion with weapon; Count V – home invasion with four victims; Count VI – home invasion alleging specific force; Count VIII – armed violence; Count IX – aggravated criminal sexual assault (mouth on vagina of Tammy Webb); Count X – aggravated criminal sexual assault (mouth on vagina of Angela Webb); Count XI – aggravated criminal sexual assault (mouth on vagina of Angela Webb); Count XII – aggravated criminal sexual assault (curling iron in vagina of Tammy Webb); Count XIII – aggravated criminal sexual assault (mouth on anus of Tywuan Jones); Count XIV –

Defense counsel asked the court to take judicial notice that no rulings had been made on post-trial motions on January 31, 1998. On January 30, 1998, the matter had been set over for investigation by independent counsel. (Motion for Substitution of Judge, R. 17) The trial court denied the motion:

> First of all, as indicated, the burden of proof is on the defendants to show actual prejudice. I might indicate that both Motions for Substitution of Judge indicates a belief that Judge Davis may be prejudice against him. While commenting on pending litigation is normally improper, those comments must deal directly with the litigation and then in somehow or in some way indicate a judge's predisposition to the case or prejudice toward a particular litigant. Both Judge Davis and I have on our felony calenders numerous home invasions and sexual assault cases. But even assuming for the sake of argument that it was in fact this case to which he was referring, I don't think the comments indicate a predisposition to any sentence or a predisposition to show any actual prejudice against these defendants. His reference to the truth-in-sentencing minimum would be the minimum sentence that would be required, does not show a predisposition. It shows, first of all, that he knows what the minimum must be under a particular situation. Nor does he indicate that he is going to or would not listen to or hear the arguments on any pending post-trial motions. Whether or not he approved of truth-in-sentencing legislation, it really carries no weight because as a judge we have the obligation to enforce the law and to apply the law without any regard to our own personal feelings or emotions whether we agree with the law or not. There is no indication that he is not going to follow the law. There is no indication that he has indicated any predisposition as to his discretion as far as sentencing is concerned. With that then show the evidence and arguments heard. The Motion for Substitution is denied.

(Motion for Substitution of Judge, R. 22-23)

On July 30, 1998, the post-trial motions were denied. (Vol. VII, R. 60) On September 3, 1998, after reviewing evidence in mitigation and aggravation, the trial court sentenced Gregory Holmes. The trial court sentenced Gregory Holmes to 15 years on Count VIII, then sentenced Gregory Holmes to 9 consecutive sentences of 10 years incarceration on the 9 counts of aggravated criminal sexual assault with an additional consecutive sentence of 10 years for Count II. For Count V, Gregory received a concurrent sentence of 15 years. (Vol. VIII, R. 41-42)

On September 15, 1998, the trial court denied the defendant's motion to reduce sentence. (Supp. Vol., September 15, 1998, R. 7) The notice of appeal was timely filed on September 25, 1998. (Vol. II, C. 237) On April 28, 2000, the appellate court issued an order affirming Gregory Holme's convictions. *People v. Gregory Holmes*, (App. Ct. No. 4-98-0768, April 28, 2000) (Rule 23 Order)

would not exercise his discretion." (Appendix at 29). However, actual prejudice does not necessarily require a showing of predisposition, but rather "animosity, hostility, ill will or distrust [directed] towards the defendant." *People v. Matlock*, 97 Ill.App.3d 842, 844, 423 N.E.2d 976, 978 (4[th] Dist. 1991) . The presence of one of these factors establishes actual prejudice. *Matlock*, 97 Ill.App.3d at 844, 423 N.E.2d at 978. Judge Davis's remarks at the Lincoln Day dinner abundantly demonstrate animosity and ill-will.

Furthermore, the sentence that Judge Davis actually imposed indicates predisposition subsequent to the political dinner, but prior to the sentencing hearing. This Court held that the bill establishing truth-in-sentencing was in violation of the constitutional single subject requirement. *People v. Reed*, 186 Ill.2d 1, 708 N.E.2d 1114 (1999). The 75 year sentence that Judge Davis "looked forward" to imposing would have required the defendant to serve only 37.5 years. Judge Davis adjusted the sentence to 115 years. The actual time that the defendant must serve, 57.5 years, is very close to the 63 years, 8 month term that Judge Davis promised his Lincoln Day audience.

## (C)

### THIS COURT SHOULD GRANT REVIEW TO CLARIFY WHETHER THE APPROPRIATE STANDARD OF APPELLATE REVIEW IN CASES INVOLVING "FOR CAUSE" MOTIONS FOR SUBSTITUTION OF JUDGE IS "ABUSE OF DISCRETION" OR "CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."

The Appellate Court analyzed the denial of the defendant's motion for substitution of judge under an incorrect standard of review. The court utilized a "contrary to the manifest weight of the evidence" standard. (Appendix at 28, *citing People v. Mercado*, 244 Ill.App.3d 1040, 1047, 614 N.E.2d 284, 288 (1st. Dist. 1993).) However, this Court has applied an "abuse of discretion" standard of review in cases involving the denial of a motion for substitution of judge. See *People v. Hall*, 114 Ill.2d 376, 406, 499 N.E.2d 1335, 1347 (1986); *People v. Vance*, 76 Ill.2d 171, 390 N.E.2d 867, 870 (1979); *People v. Polk*, 55 Ill.2d 327, 303 N.E2d 137, 141 (1973). A "for cause" motion for substitution of judge may contain allegations that go to the integrity of the adjudicatory process and the fundamentals of judicial ethics. "Abuse of discretion" accords the court considerable and sufficient deference, but still firmly asserts this Court's oversight function.

- 9 -

C. 236) The substance of these quotations was confirmed at the hearing on the motion by Jersey County Sheriff Frank Yocom and Attorney Lee Plummer, each of whom were present at the Lincoln Day dinner. (Motion for Substitution of Judge, R. 5-6, 12-13)  The motion was erroneously denied by the trial court and this disposition was erroneously upheld by the appellate court.  (Motion for Substitution of Judge, R. 22-23; Appendix at 29).

**AUTHORITIES**

The Illinois Code of Criminal Procedure allows the defendant "at any time" to move for substitution of judge, supported by affidavit. 725 ILCS 5/114-5(d) (West 1998). Upon the filing of such a motion, a hearing should be conducted as soon as possible before a different judge. 725 ILCS 5/114-5(d) (West 1998).  If the motion is allowed, the case is assigned to a judge not named in the motion; however, if the motion is denied, the case is assigned back to the judge named in the motion. 725 ILCS 5/114-5(d) (West 1998). If appellate review of the record discloses instances of inappropriate judicial behavior or intentionally unfair treatment of the defendant, then disallowing the motion is error. *See People v. Davis*, 95 Ill.2d 1, 24, 447 N.E.2d 353, 364 (1983).

The Code of Judicial Conduct addresses the specific adjudicative responsibilities of trial judges. A judge should be unswayed by partisan interests or public clamor. 145 Ill.2d R. 63 A(1).  A judge should abstain from public comment about a pending proceeding in any court. 145 Ill.2d R. 63 A(6). Additionally, the Code enjoins the judge to avoid even the appearance of impropriety by conducting himself or herself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. 145 Ill.2d R. 62 A. A judge is required to disqualify himself or herself, where the judge's impartiality might reasonably be questioned. *See Drinane v. State Farm Mut. Auto. Ins. Co.*, 153 Ill.2d 207, 214, 606 N.E.2d 1181, 1184 (1992) ([A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias.")

In *People v. Bradshaw*, 171 Ill.App.3d 971, 525 N.E.2d 1098 (1st Dist. 1988), the Appellate Court ruled that the trial judge erred by not recusing himself from the case after communicating ex parte with the victim's mother, a deputy sheriff.  The Court's concern was that the trial court's actions created an appearance of impropriety. "The judiciary is bound to maintain a favorable public impression

- 11 -

Holmes's sentence is underscored by the mandatory nature of the sentencing hearing. 730 ILCS 5/5-4-1 (West 1998). Judge Davis's comments were made prior to the sentencing hearing and, therefore, prior to receiving evidence in mitigation or aggravation.

By inappropriately discussing Gregory Holmes's case in a campaign speech, Judge Davis injected bias, prejudice, and public clamor into the case. He instigated reaction and criticism from his opponent and from the press. In so doing, he risked diminishing public confidence in the independence and impartiality of the judiciary. The impropriety is compounded by the intemperate language Judge Davis reportedly used. Judge Davis reportedly "couldn't wait" to impose sentence and would be "glad" to do so. These remarks show animosity and ill-will towards the defendant. The court erred in denying the defendant's motion for substitution of judge and the appellate court erred in denying the defendant a new sentencing hearing before a different judge.

## B.

### THE PROSECUTOR'S ELICITATION OF GREGORY HOLMES'S ASSERTION OF HIS RIGHT TO SILENCE WAS REVERSIBLE ERROR.

During the course of Gregory Holmes's trial, the prosecutor improperly elicited that Gregory had requested an attorney in violation of Gregory's Due Process rights. U.S. Const., amend. XIV. The improper elicitation resulted in an unfair trial. "'[T]he use for impeachment purposes of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment.'" *People v. Patterson*, 154 Ill.2d 414, 466, 610 N.E.2d 16, 40 (1993), citing *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245 (1976). "[P]ost arrest silence is 'insolubly ambiguous' by reason of the *Miranda* warnings. Admission of such testimony is error and violates defendant's constitutional right to remain silent . . . . No objection was made at trial to the admission of this evidence. But the plain error doctrine has been applied to the admission of testimony of this nature." *People v. Deberry*, 46 Ill.App.3d 719, 721, 361 N.E.2d 632, 634 (4th Dist. 1977). In *People v. Lucas*, 132 Ill.2d 399, 431-432, 548 N.E.2d 1003, 1015-1016 (1989), this Court found that a *Doyle* violation occurs where testimony is elicited about a defendant's request for an attorney as well as when testimony is elicited about a defendant's silence.

must demonstrate a reasonable probability that, but for the defense counsel's errors, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 692. A reasonable probability means a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 687.

Trial counsel's multiple errors, consisting of failure to object to the racially inflammatory comments from the prosecutor throughout the trial and failure to conduct a competency hearing for the minor witness Jonathon Webb, deprived Gregory Holmes of his constitutional right to the effective assistance of counsel. As a result of the flawed performance of trial counsel, the defendant suffered prejudice so extreme that the verdict of the jury may have resulted from those errors. The Appellate Court's finding that trial counsel was not ineffective for failing to object to the racial comments and the testimony of Jonathan Webb was error. (Appendix at 24, 26).

## I.

### DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFEC-TIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S IMPROPER AND INFLAMMATORY RACIAL COMMENTS.

Beginning with opening statements, the prosecutor in Gregory Holmes's case engaged in pervasive inflammatory racial remarks which should have been objected to as a violation of Gregory Holmes's Due Process rights. Trial counsel's failure to make even one objection to the improper references to race was prejudicial error. "Improper comment has been deemed plain error when it was either so inflammatory that it deprived defendant of a fair trial or so flagrant that it threatened a deterioration of the judicial process." *People v. Norfleet*, 259 Ill.App.3d 381, 390, 630 N.E.2d 1231, 1239 (1st Dist. 1994).

In the case at hand, during the course of the trial, the prosecutor made eleven references to race:

[Opening Argument]

Some of the victims in this case were **black**. Some of the victims in this case were **white**.

(Vol. IV, R. 32)

ii.

### DEFENSE COUNSEL WAS CONSTITUTIONALLY INEFFEC-TIVE FOR FAILING TO REQUEST A COMPETENCY HEARING FOR JONATHON WEBB.

Gregory Holmes's trial was severely prejudiced by the testimony of Jonathon Webb, a minor witness who was incompetent to testify. Webb's testimony was critical to the State's case because he was the only witness who tied the defendants to a white car, Specifically, Candace Dickens's white car. Therefore, trial counsel's failure to request a competency hearing for Jonathan Webb, where he was clearly incompetent to testify, was prejudicial error.

In *People v. Ridgeway*, 194 Ill.App.3d 881, 551 N.E.2d 790 (4th Dist. 1990), the Appellate Court stated the following as the appropriate factors to assess in determining if a child witness is competent.

> Our supreme court has set forth a test for determining competency of a child witness as follows: It is the degree of a child's intelligence, rather than mere chronological age, that determines a child's competence, and '[i]f the witness was sufficiently mature to receive correct impressions by her senses, to recollect and narrate intelligently, and to appreciate the moral duty to tell the truth, she was competent.'
>
> *Ridgeway*, 194 Ill.App.3d at 884, 551 N.E.2d at 791-792, *citing People v. Garcia*, 97 Ill.2d 58, 75, 454 N.E.2d 274, 280 (1983).

None of the parties involved in the case at hand ever ascertained whether Jonathon Webb understood the difference between the truth and a lie. Jonathon's testimony was so fantastical and lacking any basis in truth that it should not have been allowed. If defense counsel had requested a competency hearing, Jonathon Webb would not have been found competent to testify. Because of defense counsel's error, the introduction of Jonathon Webb's testimony at the trial of Gregory Holmes caused Gregory severe prejudice.

### D.

### THE STATE DID NOT PROVE GREGORY HOLMES GUILTY BEYOND A REASONABLE DOUBT OF COUNT XIII, AGGRAVATED CRIMINAL SEXUAL ASSAULT.

The jury's verdict, finding Gregory Holmes guilty of aggravated criminal sexual assault on Count XIII (mouth of Gary Wade on anus of Tywuan Jones), was incorrect as the essential elements

EXHIBIT A 2

its sentence. These facts entitle the defendant to a new sentencing hearing. The trial court is to consider evidence received at trial, pre-sentence reports, and evidence in mitigation and aggravation. When imposing sentence the trial court is to specify on the record the particular information or factors in aggravation and mitigation upon which it relied. While the trial court's failure to put its reasons in the record is not automatic grounds for reversal, it has been relied upon when considering if there has been an abuse of discretion. 730 ILCS 5/5-4-1 (West 1998); ***People v. Jeter***, 247 Ill.App.3d 120, 131, 616 N.E.2d 1256, 1264 (1st Dist. 1993).

In the case at hand, it is difficult to determine which factors the trial court weighed, as the court did not enunciate the underlying factors for imposition of its excessive 115 year sentence. (Vol. V, R. 41) At the sentencing hearing, Gregory Holmes presented evidence from Latoya Jones, the mother of Gregory's children, that he was a good father and helped around the house and with the care of the children. Latoya also testified that Gregory was on disability because he was a "slow learner." (Vol. VIII, R. 7-9) Thomas Wilson, Gregory's older brother, testified that Gregory was extremely helpful with their mother. Gregory's mother had mental problems and often needed to be taken care of. (Vol. VIII, R. 12-13) Stephanie Jones, a friend of Gregory's, testified that Gregory was a good father and that he often took care of his mother. (Vol. VIII, R. 14-15) Gregory Holmes had no prior history of crimes of violence. Gregory's mother has had mental health problems since he was five. (Vol. I, C. 66, 76-77)

The trial court abused its discretion in according too little weight to these mitigating factors in imposing a sentence. Because the trial court did not articulate the factors it was relying on in imposing sentence, it is unclear whether some improper factors may have been relied upon – such as the seriousness of the offense. The Appellate Court's finding that Gregory Holmes's sentence was not excessive was error. (Appendix at 31).

# APPENDIX



NO. 4-98-0768

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| GREGORY HOLMES, | ) | No. 97CF1130 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John L. Davis, |
| | ) | Judge Presiding. |

ORDER

A jury convicted defendant Gregory Holmes of three counts
of home invasion (720 ILCS 5/12-11 (West 1996)), one count of armed
violence (720 ILCS 5/33A-2 (West 1996)), and nine counts of
aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West
1996)). The trial court sentenced him to a total of 115 years in
prison. He appeals, arguing that (1) the prosecutor's elicitation
of his assertion of his right to remain silent was reversible
error; (2) he was denied a fair trial due to (a) improper racial
remarks made by the prosecutor, (b) the trial court's failure to
evaluate the competency of a child witness, and (c) trial counsel's
incompetency in failing to object to the racial remarks and make a
competency objection to the testimony of the child witness; (3) the
State failed to prove him guilty beyond a reasonable doubt as to
count XIII of the information, charging aggravated criminal sexual
assault; (4) the trial court erred in denying his motion for
substitution of judge, where prejudicial remarks were made by the
trial judge at a political function concerning defendant's likely

lie on the floor.  Lofton was going through her drawers at that time.  Defendant held the gun to her head while she lay nude on the floor.  He told L.C. that she was a "nasty bitch" and that she must be "horny" because her boyfriend was in jail.

Defendant placed the gun in her mouth and told her to lick it.  She did as she was told.  Lofton came into the living room, called her a "lying bitch," and told her he knew she had some money for her boyfriend's bond.  She again said she had no money. Defendant began to "stomp" her in the head with his foot.  She was still on the floor.  The men again called her a "lying bitch" and said they would kill her daughter if she did not give them money. Lofton pulled out a screwdriver and handed it to defendant.  He told defendant to "fuck that bitch."  Defendant told her to spread her legs.  He then "stuck" the screwdriver into her vagina for approximately a minute.  Defendant pulled her by the hair back into her bedroom.  Lofton continued to search her bedroom and the bathroom for money.  When the search ended, the men took her telephone, pager, and a box containing a Sony Play Station.  She was dragged by her hair down the back stairs and told to lie down on the concrete stairs and pray, because they were going to shoot her in the back of the head.  She started praying, and they told her to pray louder.  They opened the door and ran out of the house. She heard car doors close and a car speed away.  She did not see the car.  She ran across the street to a neighbor's house and called the police.

L.C. testified that she identified defendant and Lofton in a police lineup after hearing them speak.  She had scars on her head from the attack and suffered from "trauma headaches" for

- 3 -

A - 3

ordered to perform oral sex on each other simultaneously.  A.W.'s mouth made contact with T.W.'s vagina and T.W.'s mouth made contact with A.W.'s vagina.  This went on for approximately 10 minutes.  At one point, one of the men hit A.W. on the head and told her she was not "doing it right."  M.W. and J.W. were seated in the living room while this was taking place.  Defendant sat in a chair about two feet away from A.W. and T.W., holding the gun.

One of the men then ordered T.J. to lick A.W.'s anus. T.J. complied and his mouth came in contact with her anus. Defendant stood right above them.  Lofton called G.W. out of T.W.'s bedroom, and he also was ordered to take off his clothes.  Lofton took T.W. into her bedroom.  T.W.'s daughter was there.  A.W. heard T.W. yell, "Not in front of my daughter, please."  Still holding the gun, defendant told G.W. to lick A.W.'s vagina.  His mouth came in contact with her vagina.  Lofton brought T.W. back into the room and she was ordered to perform oral sex on G.W.  A.W. was ordered to perform oral sex on T.J.  Her mouth made contact with T.J.'s penis.  After this went on for five minutes, A.W. was hit in the head and told she was not "doing it right."  Defendant told T.W. she was not "doing it right" and hit her in the side of the head with the gun.  T.W. was crying and saying, "Please.  No."

A.W. testified that T.J. was ordered to perform oral sex on her and did so.  G.W. was also ordered to perform oral sex on her and did so.  Defendant and Lofton took $80 in cash from T.W., her pager, and A.W.'s pager.  Before they left, the men forced all the adults to lie face down on the floor.  They said that if anyone got up off the floor or looked out the window, they would all die. A.W. did not see the men leave.  After they left, the adults and

chair in her bedroom, and he inserted a curling iron in her vagina.
T.W. asked Lofton not to do this in front of her daughter.  Lofton
said, "Shut up, bitch."  T.W. was crying, and Lofton told her to
stop being a baby and to quit crying.  Lofton kept opening the
curling iron while it was in her vagina.  She asked him to stop,
because her daughter was watching.  At some point, she began to
bleed.  After Lofton took her back to the living room, she was
forced to perform oral sex on G.W.

    T.W. stated she gave her pager to Lofton, and defendant
took G.W.'s coat.  During this time, defendant called Lofton "D-
Money."  T.W. identified defendant and Lofton as the perpetrators
in a showup.  She sought medical help at a hospital emergency room.
She bled from her vagina for about two weeks after the incident.
She had a small cut and bruises on her face and experienced
swelling.  Her ear canal was swollen shut from being hit on the
side of her face.

    T.W. testified that approximately two weeks before the
incident, Carney had invited defendant and Lofton to the house.
T.W. did not know who they were.  She left to run an errand and
when she returned, some money she had placed on her nightstand was
gone.  She told Carney about it and that defendant and Lofton would
have to leave.  Two nights before the incident, the men were again
at the house with Carney and A.W.  T.W. told both women that
defendant and Lofton would have to leave.  The reason the alleged
victims went to Carney's house after the incident was to learn
defendant's last name and Lofton's name.  Carney had moved out on
August 19 with no notice.

    T.J. testified that defendant ordered G.W. to lick T.J.'s

J.W. testified that he is seven years old.  He testified as to the school he attended and his teacher's name.  A.W. and T.W. are his aunts.  He recalled that on the night of the incident, T.W., A.W., G.W., T.J., and M.W. were at the house.  He slept that night in a chair in the living room.  M.W. slept on the couch.  He was awakened by someone kicking the door.  Two black men broke into the house.  The shorter man had a gun.  They were saying "cuss words" and "hit the floor."  One of the men got a can and threw it at G.W.  It hit him on the head.  J.W. saw a white man waiting outside for the black men.  One of the men called the other "gee-money or something like that."  He saw the two black men leave.  They "went around a circle," then got into a car.  The car was white with a dark black or dark red spot on the car.  J.W. identified a photograph of a car that he said defendant and Lofton got into after leaving.  The following exchange occurred between the prosecutor and J.W.:

"Q.  Okay.  Where do you remember seeing spots on the white car?

A.  When he pulled out of the driveway.

Q.  No; where on the car did you see spots?

A.  That one right there.

Q.  Okay.  Are you pointing to the back, [n]ear the tail[]lights?

A.  Yes.

Q.  What color was that spot you saw on the white car?

A.  I seen a dark red and dark black,

- 9 -

A - 9

tor asked Moore if that was the complete interview he had with defendant. Moore responded that defendant asked for an attorney, and Moore took him to the county jail. Defense counsel's objection to this last statement was overruled. Counsel's motion for a mistrial was denied.

G.W.'s testimony was similar to that of the other alleged victims. He testified that when he was ordered to lick T.J.'s anus, his mouth did not come in contact with the anus; rather, his mouth made contact with "[t]he cheek of [T.J.'s] butt." G.W. identified defendant and Lofton by their clothing and shoes later that day in a showup.

Candace Dickens testified that she has known defendant and Lofton for six or seven months. She owns a white car that has a rust spot on the passenger side near the taillight. She has never allowed defendant or Lofton to use the car.

Police officer Jason Van Alstine testified that he interviewed L.C. about what happened at her house. He did not see any injuries. She appeared to be upset at the time of the interview.

Dickens testified on defendant's behalf that at 10 p.m. on August 19, 1997, she was at her mother-in-law's house at 459 Longview. Defendant came to the house about "eleven something." Lofton was with him. They left after about 10 minutes and went to Latoya T.J.' house on Longview. Dickens also went there about midnight. She, her mother-in-law, Lofton, and Doris Nelson went to the store in Dickens' car. They returned to Latoya's house 10 minutes later. Approximately 20 minutes later, Dickens, her mother-in-law, and Nelson left. The time was approximately 12:30

car.

Latoya testified that defendant and Lofton left her house around 8:30 p.m. on August 19, 1997, and returned about 9 or 10 p.m. Lofton, Dickens, Cooper, and Nelson returned from Mr. B's at 11:30 p.m. Dickens, Cooper, and Nelson left Latoya's house around 1 a.m. Defendant and Lofton were in the living room. Nelson came back to do Latoya's hair. This took about 30 minutes. Latoya fixed tacos for defendant and Lofton. The police knocked on her door while she was fixing tacos. Defendant was wearing a blue shirt and black pants. Lofton was wearing a white shirt. Latoya does not know Lofton as "Tay" or "D-Money."

The jury convicted defendant as stated. He was sentenced on September 3, 1998. Prior to sentencing, defense counsel filed a motion for substitution of judge, alleging that the trial judge, John L. Davis, was prejudiced against defendant. The motion alleged that (1) according to a newspaper article, Judge Davis made certain public comments about the case on January 31, 1998; and (2) the matters set forth in the article indicate Judge Davis had prejudged defendant's posttrial motions. The motion for substitution attached an affidavit of defense counsel and a copy of an article from the State Journal-Register published on March 1, 1998.

In summary, the article stated that Judge Davis had spoken at a Jersey County Republican Lincoln Day dinner. The author of the article spoke to circuit judge Thomas Appleton, who was running against Judge Davis in the Republican primary for a seat on this court. Judge Appleton stated that Judge Davis told those at the dinner that he was "'looking forward'" in the next week to imposing "'a 75-year sentence on two young men who were

- 13 -

Frank Yocom, sheriff of Jersey County, testified that he attended the Lincoln Day dinner. Judge Davis said that "he couldn't wait to get back home to sentence a couple of defendants [who] were charged with home invasion and a sexual assault to [75] years." The judge also spoke about truth in sentencing as to the number of years on the sentences, but Yocom did not recall the exact number of years. Yocom testified that Judge Davis spoke about other subjects during his speech, but Yocom did not recall the nature of those subjects. Judge Davis' comments about the sentencing "stuck in [his] mind because it pleased [him] what [Judge Davis] said." Yocom was not a supporter of either Judge Davis or Judge Appleton before or after the dinner. He did not speak to any reporters. Yocom does not believe Judge Davis mentioned the names of the defendants he was to sentence.

Judge Hendrian denied the motion, finding that defendant had failed to show that Judge Davis was predisposed to impose any particular sentence or that he would not listen to arguments on defendant's posttrial motion.

Defendant's posttrial motion was denied by Judge Davis on September 3, 1998. Thereafter, a sentencing hearing was held. Latoya testified that defendant is the father of her three children. Defendant is a good father, and he helped her around the house. He has never abused her or the children. He also helped his mother financially and helped her cook. His mother has a "mental problem." Defendant has a learning disability and was receiving supplemental security income. Latoya and defendant have lived together for four years. During that time, defendant did not have a job.

EXHIBIT A 3

This rule, however, is not absolute.  In People v. Lucas, 132 Ill. 2d 399, 548 N.E.2d 1003 (1989), defendant was convicted of murder and sentenced to death.  He claimed on appeal that his due process rights had been violated by a reference in the testimony to the fact that he had asked for an attorney during questioning by police.  The prosecutor, in cross-examining defendant's mother, asked, "Now, after you--was that the only conversation you had with [defendant] then?"  Lucas, 132 Ill. 2d at 431, 548 N.E.2d at 1016. Defendant's mother replied, "No.  The investigators had told me that [defendant] had asked for a lawyer."  Lucas, 132 Ill. 2d at 431, 548 N.E.2d at 1016.  Defense counsel objected and moved for a mistrial.  He stated he did not want the testimony stricken or a curative instruction given, to avoid drawing the jury's attention to the statement.  The trial court sustained the objection, but denied the motion for mistrial on the bases that the prosecutor had not elicited the statement, it had been volunteered by the witness, and the defendant had not been prejudiced by it.  Lucas, 132 Ill. 2d at 431, 548 N.E.2d at 1016.  The supreme court held that the rule stated in Doyle applied to references in testimony to the fact that a defendant requested a lawyer following his arrest and Miranda warnings.  It also found that the reference to defendant Lucas' request for a lawyer did not constitute reversible error. The court noted the reference was not elicited by the prosecutor, but was volunteered by the witness.  Immediately after the statement was made, the trial court sustained defendant's objection and instructed the witness to make no further references to defendant requesting an attorney.  The prosecutor made no attempt to use defendant's request for an attorney to impeach him and did

defendant of a fair trial, or any substantial error occurs and the evidence is closely balanced. Laugharn, 297 Ill. App. 3d at 810-11, 698 N.E.2d at 222.

In the alternative, defendant argues that his trial counsel was ineffective for failing to object to these alleged errors and include them in defendant's posttrial motion. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) but for counsel's unprofessional errors, a reasonable probability exists that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984). A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. We note that if defendant has not satisfied one component of the Strickland test, the reviewing court need not consider the other component. People v. Beals, 162 Ill. 2d 497, 506, 643 N.E.2d 789, 794 (1994).

1. Prosecutor's Alleged Improper Remarks

Defendant complains of the following comments made by the prosecutor.

a. During the prosecutor's opening statement, he told the jury that some of the alleged victims were white and some were black.

b. During his examination of J.W., the prosecutor asked him how many people came into A.W.'s house. J.W. said there were two. The prosecutor then asked whether the people were black or white. J.W. stated they were black.

- 19 -

A - 19

acteristic of both crimes--the only sexual assaults personally performed by the perpetrators involved inserting an inanimate object into a woman's vagina."

f. At another point in closing argument, the prosecutor stated that T.J. had "committed the unpardonable sin of dissing another young black male." This reference was to an argument T.J. had with defendant prior to the night of the attack.

g. During closing argument, the prosecutor said: "But the victims in this case aren't high[-] profile people. The victims in this case probably aren't even middle class. You saw videotapes of the houses in which they lived. The victims were black. The victims were white. The victims had criminal records. These victims weren't living the American dream.

The problem with justice in America has been, and often continues to be[,] that victims who get justice are often those who have wealth. Victims who get justice are often those who have a certain color of skin. Those victims on the bottom of the socioeconomic ladder are often left to scrounge for the few morsels of justice scattered on the ground. Although [the alleged victims] may have seemed like easy marks to [defendant and Lofton], people whom [defendant and Lofton] thought no

- 21 -

unnecessary references to race would carry more weight. Defendant makes no showing as to how he was prejudiced by the prosecutor's question to G.W.

The reference to Applegate's race in the prosecutor's questioning of Dickens was intended to help Dickens recall which detective she had talked to. We find nothing improper about this question.

Defendant argues that the prosecutor's references to race in his closing argument were gratuitous and prejudicial. He cites People v. Brown, 170 Ill. App. 3d 273, 524 N.E.2d 742 (1988), in which the defendant was convicted of aggravated criminal sexual assault. One of his contentions on appeal was that the prosecutor impermissibly injected a racial element into the trial by noting that the victim was a black woman and suggesting the defense had tried to "cheapen" the idea that every person is entitled to the protection of the law, regardless of race. Prior to addressing this argument, the appellate court had found that other trial errors required reversal. Although not required to do so, the court addressed the argument in the event the question arose on retrial. The court noted that the prosecutor had no valid reason to refer to the victim's race. However, the court did not state whether it considered this error to be reversible. Brown, 170 Ill. App. 3d at 283-84, 524 N.E.2d at 749. Brown has no applicability to our case.

In arguing to the jury that the same alleged perpetrators were responsible for the attacks on all the victims, the prosecutor detailed the similarities between the incidents. The prosecutor noted that both alleged perpetrators were black. This comment was

- 23 -

determination of a witness' competency:

"(a) Every person, irrespective of age,
is qualified to be a witness and no person is
disqualified to testify to any matter, except
as provided in subsection (b).

(b) A person is disqualified to be a
witness if he or she is:

(1) Incapable of expressing himself or
herself concerning the matter so as to be
understood, either directly or through inter-
pretation by one who can understand him or
her;  or

(2) Incapable of understanding the duty
of a witness to tell the truth.

(c) A party may move the court prior to a
witness' testimony being received in evidence,
requesting that the court make a determination
if a witness is competent to testify.  The
hearing shall be conducted outside the pres-
ence of the jury and the burden of proof shall
be on the moving party."

The degree of a child's intelligence, rather than mere
chronological age, determines the child's competency as a witness.
People v. Ridgeway, 194 Ill. App. 3d 881, 884, 551 N.E.2d 790, 791
(1990).  If the witness is sufficiently mature to receive correct
impressions by his senses, to recollect and narrate intelligently,
and to appreciate the moral duty to tell the truth, he is compe-
tent.   People v. Davis, 10 Ill. 2d 430, 436, 140 N.E.2d 675, 680

- 25 -

reasonable doubt of the defendant's guilt." <u>People v. Brown</u>, 185
Ill. 2d 229, 247, 705 N.E.2d 809, 817 (1998).    The test to be
employed on review is "'whether the record evidence could reason-
ably support a finding of guilt beyond a reasonable doubt.'"
<u>People v. Howery</u>, 178 Ill. 2d 1, 38, 687 N.E.2d 836, 854 (1997),
quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 318, 61 L. Ed. 2d 560,
573, 99 S. Ct. 2781, 2788-89 (1979).

While G.W. testified that he did not make such contact,
T.J. testified that G.W., in fact, had "licked" his anus.
Determinations as to the credibility of the witnesses, the weight
to be given their testimony, and inferences to be drawn therefrom
lie within the province of the jury.    <u>People v. Bull</u>, 185 Ill. 2d
179, 204, 705 N.E.2d 824, 837 (1998).    A reviewing court will not
overturn a jury's verdict where the evidence is merely conflicting.
<u>People v. DePue</u>, 229 Ill. App. 3d 615, 619, 593 N.E.2d 1115, 1118
(1992).    We note that the testimony of one witness, including the
victim, is sufficient to convict.    <u>People v. Brink</u>, 294 Ill. App.
3d 295, 300, 690 N.E.2d 136, 139 (1998).    The jury obviously found
the testimony of T.J. to be more credible on this issue.    We
conclude that the evidence was sufficient to prove defendant guilty
beyond a reasonable doubt as to the aggravated criminal sexual
assault of T.J.

D. Motion for Substitution of Judge

Defendant argues that Judge Hendrian erred in denying his
motion for substitution of judge.    He alleges that the comments
made by Judge Davis in his speech at the Lincoln Day dinner
established that he was prejudiced against defendant.

A defendant may move at any time during the pendency of

- 27 -

derance of the evidence that those comments demonstrated prejudice against him.    Judge Davis spoke about truth in sentencing and indicated his approval of that concept.    However, nothing in his remarks indicates that he had predetermined defendant's sentence and would not exercise his discretion at the sentencing hearing. Judge Davis' explanation of his comments in the newspaper article indicates that he believed the minimum total prison sentence defendant could receive under the law was 75 years.    Although at the sentencing hearing, the prosecutor and defense counsel agreed that the minimum sentence was 69 years, this discrepancy does not change our conclusion, because a defendant must show that the judge is <u>actually</u> prejudiced against him.    If Judge Davis believed that 75 years in prison was the minimum sentence in defendant's case, then his statement to that effect does not show prejudice.    We therefore conclude that no error occurred in the denial of defendant's motion for substitution of judge.

### E. Unconstitutionality of Statute Increasing Penalties for Armed Violence with a Category I Weapon

Defendant contends that Public Act 88-680 violates the single subject requirement of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IV, §8(d)).    That legislative enactment increased the minimum penalty for armed violence committed with a category I weapon from 6 years to 15 years in prison.

We need not address defendant's constitutional argument, because our supreme court has now held that Public Act 88-680 does violate the single subject rule of the constitution.    <u>People v. Cervantes</u>, 189 Ill. 2d 80, 94-95, 723 N.E.2d 265, 272 (1999).

A statute held to be unconstitutional is void <u>ab initio</u>.

- 29 -

care and support of his mother, (4) young family, and (5) rehabili-
tative potential. However, the trial court stated, in imposing
sentence, that it had considered all mitigating, as well as
aggravating, factors. The trial court was not required to give
more weight to mitigating factors than to the seriousness of the
offense and the need to protect the public. See <u>People v. Mayoral</u>,
299 Ill. App. 3d 899, 913, 702 N.E.2d 238, 248 (1998). Here, given
defendant's depraved and heinous actions, we conclude the trial
court struck the proper balance in imposing the sentences.

### G. Extra Day of Sentence Credit

The trial court awarded defendant 379 days of credit
against his sentence for time served in jail. Defendant argues
that he is entitled to one additional day of credit. The State
does not disagree with this argument. Accordingly, we order that
the judgment of conviction and sentence be amended to reflect that
defendant is entitled to a total of 380 days of sentence credit.

### III. CONCLUSION

Defendant's convictions are affirmed. His sentences,
with the exception of the sentence on the armed violence convic-
tion, are affirmed. The sentence on that conviction is vacated and
the cause remanded for resentencing thereon and for amendment of
the order of judgment and sentence to reflect a total of 380 days'
sentence credit.

Affirmed in part, vacated in part, and remanded with
directions.

GARMAN, J., with MYERSCOUGH and KNECHT, JJ., concurring.



121 S.Ct. 633                                                Page 1

531 U.S. 1040, 121 S.Ct. 633, 69 USLW 3381, 148 L.Ed.2d 541
**(Cite as: 531 U.S. 1040, 121 S.Ct. 633)**

*Direct Appeal*

**H**

Supreme Court of the United States
**Gregory HOLMES**, petitioner,
v.
ILLINOIS.
**No. 00-6443.**

Dec. 4, 2000.

Case below, 312 Ill.App.3d 1125, 264 Ill.Dec. 79,
769 N.E.2d 581.

Petition for writ of certiorari to the Appellate Court
of Illinois, Fourth District, denied.

U.S.,2000
Holmes v. Illinois
531 U.S. 1040, 121 S.Ct. 633, 69 USLW 3381, 148
L.Ed.2d 541

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

NO.

IN THE

## SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
| Plaintiff-Respondent, | ) ) | No. 4-00-0962 |
| | ) ) | There on appeal from the Circuit Court of the |
| vs. | ) ) ) ) | Sixth Judicial Circuit, Macon County, Illinois, No. 97-CF-1130. |
| GREGORY HOLMES, | ) ) | Honorable Theodore E. Paine, |
| Defendant-Petitioner. | ) | Judge Presiding. |

# **PETITION FOR LEAVE TO APPEAL**

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 S. 9th Street, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

MARTIN J. RYAN
Assistant Defender

COUNSEL FOR DEFENDANT-PETITIONER

*ORAL ARGUMENT REQUESTED*

EXHIBIT C

NO.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Appellate Court of Illinois, Fourth Judicial District, |
|     Plaintiff-Respondent, | ) ) | No. 4-00-0962 |
| | ) ) ) | There on appeal from the Circuit Court of the |
|     vs. | ) ) ) | Sixth Judicial Circuit, Macon County, Illinois, No. 97-CF-1130. |
| | ) ) | |
| GREGORY HOLMES, | ) ) | Honorable Theodore E. Paine, |
|     Defendant-Petitioner. | ) | Judge Presiding. |

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE
STATE OF ILLINOIS:

May It Please The Court:

## I.

## PRAYER FOR LEAVE TO APPEAL

Now comes Gregory Holmes, defendant-petitioner, and respectfully petitions

this Court pursuant Illinois Supreme Court Rules 315 and 612(b) for leave to

appeal from the judgment of the Appellate Court of Illinois, Fourth Judicial

District, which, after a remand for re-sentencing, affirmed the defendant's

sentence of 110 years in prison.

## II.

## PROCEEDINGS IN THE APPELLATE COURT

On April 19, 2004, the Appellate Court of Illinois, Fourth Judicial District, after a remand for re-sentencing, affirmed the defendant's sentence of 110 years in prison. No petition for rehearing was filed. The defendant filed an affidavit of intent to seek leave to appeal on April 21, 2004. A copy of the Appellate Court's Illinois Supreme Court Rule 23 Order and of the affidavit of intent are attached as an appendix.

## III.

## REASONS FOR GRANTING REVIEW

Leave to appeal should be granted to resolve an important question of first impression in this Court concerning 730 ILCS 5/5-8-4(c)(2) (West 1998), which limits the aggregate of consecutive sentences to the "maximum terms authorized under [730 ILCS 5/]5-8-2]" for the two most serious felony convictions. At stake in this case is whether the aggregate limit on Gregory Holmes' sentence is 60 years or 120 years. For a Class X felony, the maximum extended term is 60 years in prison, and the maximum ordinary term is 30 years. 730 ILCS 5/5-8-1(a)(3) (West 1998); 730 ILCS 5/5-8-2(a)(2) (West 1998). The crux of the issue presented to this Court for guidance is whether the phrase "maximum sentence" should be given the opposite meaning from the phrase "maximum terms authorized," as has been done by the Illinois Appellate Court. If the above phrases are treated similarly, then Mr. Holmes' aggregate sentence can only be 60 years, and the excess 50 years of his of 110-year term is void. Because section 5-8-4(c)(2) sets the upper limit for aggregating consecutive sentences, its interpretation is an important issue both to prisoners, whose sentences are governed by it, and to Illinois Courts, which must consider section 5-8-4(c)(2) whenever consecutive sentences are imposed.

In *People v. Palmer*, 148 Ill.2d 70, 592 N.E.2d 940 (1992), and in *People v. Pastewski*, 164 Ill.2d 189, 647 N.E.2d 278 (1995), this Court interpreted the phrase "maximum sentence," contained in 730 5/5-2-4(b) (which governs the term which an insanity acquittee may be incarcerated) as being subject to a defendant's eligibility for an extended term. In *Palmer*, this Court concluded that,

> It is clear that the trial court may commit an insanity acquittee to a maximum period by reference to [730 ILCS

-3-

> 5/]5-8-1. *In order to commit an insanity acquittee by reference to the extended-term statute, however, the trial court must first find that the insanity acquittee's offense comes within the statutory requirements for application of section 5-8-2(a).* Section 5-8-2(a) refers to the factors in aggravation set forth in paragraph (b) of section [730 ILCS 5/]5-5-3.2. Section 5-5-3.2(b)(2) requires that, in order for an extended-term sentence to be applicable, the trial court must find that the offense is accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.
>
> *Palmer*, 148 Ill.2d at 86, 592 N.E.2d at 947 (emphasis added).

Because an insanity acquittee's conduct does not indicate wanton cruelty, a judge could not resort to section 5-5-3.2(b)(2) to calculate the length of his commitment term. *Palmer*, 148 Ill.2d at 92-94, 592 N.E.2d at 950-51.

In *Pastewski*, this Court held that the judge properly resorted to section 5-5-3.2(b) in setting the maximum period of the insanity acquittee's commitment, where the acquittee, by reason of his prior convictions, would have qualified for an extended term sentence had he been found guilty. *Pastewski*, 164 Ill.2d at 196-98, 647 N.E.2d at 282-83. In short, this Court construed the phrase "maximum sentence" of section 5-2-4(b) to only allow reference to the extended term statute (section 5-5-3.2(b)) where a judge found that the defendant qualified for an extended term.

Section 5-8-4(c)(2), which sets the upper limit for aggregating consecutive prison sentences, contains similar language to section 5-2-4(b). Section 5-8-4(c)(2) provides that "the aggregate of consecutive sentences . . . shall not exceed the sum of the *maximum terms authorized* under Section 5-8-2 for the 2 most serious felonies involved. . . ." (Emphasis added). Section 5-8-2, in turn, prohibits imposition of an extended term "unless the factors in aggravation set

-4-

forth in paragraph (b) of Section 5-5-3.2 were found to be present." Section 5-8-2 further provided that a court "may sentence an offender" to extended term "[w]here the judge finds that such factors are present." Section 5-8-2 thus does not "authorize" extended terms unless the court finds that one of the listed factors applies to the defendant. Accordingly, the phrase "maximum term authorized under Section 5-8-2," contained in section 5-8-4(c)(2) appears to have the same meaning as the phrase "maximum sentence" as contained in section 5-2-4(b), the insanity acquittee statute.

This Court has never directly addressed this issue. In passing, this Court has remarked in *dicta* that "section 5-8-4(c)(2) refers to the aggregate of the maximum *extended* terms authorized for the two most serious felonies involved." *People v. Tucker*, 167 Ill.2d 431, 437, 657 N.E.2d 1009, 1011-12, (1995) (emphasis in original). However, Mr. Tucker actually received, and thus apparently qualified for, extended term sentences, and so the authorized maximum penalty for Tucker was the twice maximum extended term penalty for the two most serious convictions. *Id.* Thus, this Court's statement in *Tucker* is consistent with the defendant's construction of section 5-8-4(c)(2) and section 5-2-4(b); the maximum term for any defendant may include the extended term sentence length, but only if the defendant is found to qualify for an extended term. The instant argument was not presented to this Court in *Tucker*, which involved interpreting a different part of section 5-8-4(c)(2). *Tucker*, 167 Ill.2d at 435, 657 N.E.2d at 1012.

The Appellate Court failed to explain why "maximum term authorized" should be treated differently from "maximum sentence" in light of *Palmer* and *Pastewski*. The Appellate Court noted that this was not an insanity acquittal case,

but never addressed the linguistic similarities. *People v. Holmes*, (Appendix, p. A-12).    Further, the Appellate Court relied upon three other Appellate Court opinions, none of which interpreted *Palmer* or *Pastewski*. *Holmes*, (Appendix, pp. A-7 - A-10).  The Appellate Court here also erroneously treated *Tucker* as if it had been presented with and had ruled upon the issue of whether section 5-8-4(c)(2) mandated reference to extended terms in every case involving consecutive sentences.   (Appendix, pp. A-6 - A-7)  In short, the Appellate Court's order provides no reason to treat similar language differently.

In short, the Illinois Appellate Court's interpretation of section 5-8-4(c)(2) is contrary to this Court's opinions in *Palmer* and *Pastewski*.  Prisoners like Mr. Holmes who are affected by this error have sentences far longer than authorized by law.  This Court's guidance is needed to correct this error, and to illustrate proper statutory interpretation to the Appellate Court.

# IV.

## POINT RELIED UPON FOR REVERSAL

**GREGORY HOLMES'S CONSECUTIVE SENTENCES TOTALING 110 YEARS ARE VOID, AND MUST BE MODIFIED TO A TOTAL NOT EXCEEDING SIXTY YEARS, THE MAXIMUM AUTHORIZED BY LAW.**

# V.

## STATEMENT OF FACTS

Defendant Gregory Holmes was jointly tried before a jury with co-defendant Donte Lofton from December 16 through December 23, 1997. The defendant was acquitted on December 23 of two counts of armed robbery, one count of home invasion, and one count of aggravated criminal sexual assault. The defendant was also convicted of nine counts of aggravated criminal sexual assault, three counts of home invasion, and one count of armed violence. (Supp. Vol. II, C. 241)

The defendant was originally sentenced on September 3, 1998 to an overall sentence of 115 years in prison. No sentence was entered on Count VI, one of the home invasion counts. The defendant was sentenced to consecutive terms of: 10 years for each of the aggravated criminal sexual assault convictions; 10 years for home invasion (Count II); and 15 years for armed violence. The court also imposed a concurrent 15-year sentence for home invasion (Count V). (Supp. Vol. II, C. 220-21; Supp. Vol. XI, R. 41-42)

On April 28, 2000, in General No. 4-98-0768, the Appellate Court affirmed the defendant's convictions and sentences, except that it vacated his 15-year sentence for armed violence, remanded for re-sentencing on that conviction, and awarded the defendant an additional day of sentence credit. (Appendix, pp. A-29 – A-31)

On October 5, 2000, the defendant was re-sentenced to 10 years for the armed violence count, with the sentence to run consecutively to the other counts, reducing the overall sentence to 110 years in prison. (Vol. I, C. 19; Vol. III, R. 16-17) A timely motion to reconsider sentence was filed on October 12, 2000. (Vol. I, C. 22) The motion alleged that the sentence was excessive and that the court did

not properly consider the factors in mitigation, the defendant's rehabilitative potential, and the lengthy sentence previously imposed. (Vol. I, C. 22) The motion was denied on October 12, 2000. (Vol. III, R. 21-23)

On appeal, the Appellate Court, Fourth Judicial District, affirmed Mr. Holmes' sentence on April 19, 2004 by an Illinois Supreme Court Rule 23 Order. *People v. Holmes*, (Appendix, p. A-2). No petition for rehearing was filed. An affidavit of intent to seek leave to appeal was filed April 21, 2004. (Appendix, p. A-15)

## VI.

## ARGUMENT

**GREGORY HOLMES'S CONSECUTIVE SENTENCES TOTALING 110 YEARS ARE VOID, AND MUST BE MODIFIED TO A TOTAL NOT EXCEEDING SIXTY YEARS, THE MAXIMUM AUTHORIZED BY LAW.**

Mr. Holmes was convicted of thirteen Class X felonies. The authorized penalty for a Class X felony is six to thirty years' imprisonment. 730 ILCS 5/5-8-1(a)(3) (West 1998). No sentence was imposed for one of the convictions, and another was ordered to run concurrently to the others. (Supp. Vol. II, C. 220-21; Supp. Vol. XI, R. 41-42) As it now stands after the re-sentencing hearing, the defendant's sentence consists of consecutive terms of 10 years for each of the remaining eleven convictions. (Vol. I, C. 19; Vol. III, R. 16-17; Supp. Vol. II, C. 220-21; Supp. Vol. XI, R. 41-42) The total of the eleven terms is 110 years.

This total is unauthorized by law, and hence void, as the total of the sentences cannot exceed the sum of the maximum terms authorized under 730 ILCS 5/5-8-2 (West 1998) for the two most serious felonies involved. Because the maximum term authorized under that section for each of Holmes's equally serious offenses is thirty years, the total of his consecutive sentences cannot top sixty years. His sentences must be vacated, and the case remanded for re-sentencing not to exceed 60 years in prison. Alternatively, this Court should reduce the defendant's overall sentence to sixty years.

The legislature defines crimes and establishes criminal penalties, and the "trial court, upon determination of guilt, has no authority to assess a fine or impose a sentence other than that provided by statute." *People v. Wade*, 116 Ill.2d 1, 6, 506 N.E.2d 954, 956 (1987) (citations omitted). "Such legislative action necessarily limits the inquiry and function of the judiciary in imposing sentences."

-10-

*People ex rel. Carey v. Chrastka*, 83 Ill.2d 67, 79, 415 N.E.2d 1269, 1275 (1980). Where a court "imposes a sentence in excess of what the statute permits, . . . the excess portion of the sentence is void." *In re T.E.*, 85 Ill.2d 326, 333, 423 N.E.2d 910, 913 (1981) (citations omitted).

Because the defendant's claim is that a portion of his sentence is void, it is of no consequence that he did not raise this issue upon his remand for re-sentencing. If a court's order is void, it may be challenged at any time. *In re T.E.*, 85 Ill.2d at 333, 423 N.E.2d at 913.

Construing a statutory scheme involves a question of law where *de novo* review is appropriate. *People v. Robinson*, 172 Ill.2d 452, 457, 667 N.E.2d 1305, 1307 (1996). Thus, *de novo* review is the applicable standard of review.

The legislature authorized the courts to impose consecutive sentences. 730 ILCS 5/5-8-4 (West 1998). However, the legislature set a limit on the aggregate of the consecutive sentences a court could impose on an individual. "[T]he aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under Section 5-8-2 for the 2 most serious felonies involved." 730 ILCS 5/5-8-4(c)(2) (West 1998). Section 5-8-2 of the Unified Code of Corrections ("the Code") provides, in part:

> Extended Term. (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5-8-1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5-5-3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:
>
>         *                *                *
>
>     (2) for a Class X felony, a term shall be not less than 30 years and not more than 60 years;

730 ILCS 5/5-8-2(a)(2) (West 1998).

-11-

Section 5-8-1(a)(3) sets the penalty range at six to thirty years for a Class X felony. Thus, the maximum prison term authorized by section 5-8-2 for a Class X felony is thirty years, unless one or more of the 730 ILCS 5/5-5-3.2(b) (West 1998) aggravating factors is found by the sentencing judge, in which case section 5-8-2 authorizes a maximum term of sixty years.

Here, the sentencing judge never found that any of the extended-term factors applied to the defendant, and did not impose an extended term on any of the offenses. (Vol. III, R. 15-16; Supp. Vol. XI, R. 33-42) Thus, under the clear language of the statutory scheme, the total of the consecutive sentences imposed on the defendant could not exceed sixty years, and the excess portion of his 110-year sentence is void.

This interpretation of section 5-8-2 is consistent with and supported by this Court's opinions in *People v. Palmer*, 148 Ill.2d 70, 592 N.E.2d 940 (1992), and *People v. Pastewski*, 164 Ill.2d 189, 647 N.E.2d 278 (1995), which address the maximum period a person can be committed after having been found not guilty by reason of insanity. The involuntary commitment period after an insanity acquittal "shall not exceed the maximum length of time that the defendant would have been required to serve, less credit for good behavior, before becoming eligible for release had he been convicted of and received the maximum sentence for the most serious crime for which he has been acquitted by reason of insanity." 730 ILCS 5/5-2-4(b) (West 1998). This Court in *Palmer* interpreted section 5-2-4(b)'s "maximum sentence" as being subject to a defendant's eligibility for an extended term, stating,

> It is clear that the trial court may commit an insanity acquittee to a maximum period by reference to section 5-8-1. *In order to commit an insanity acquittee by reference to the extended-term statute, however, the trial*

-12-

> *court must first find that the insanity acquittee's offense comes within the statutory requirements for application of section 5-8-2(a).* Section 5-8-2(a) refers to the factors in aggravation set forth in paragraph (b) of section 5-5-3.2. Section 5-5-3.2(b)(2) requires that, in order for an extended-term sentence to be applicable, the trial court must find that the offense is accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

*Palmer*, 148 Ill.2d at 86, 592 N.E.2d at 947 (emphasis added).

Because an insanity acquittee's conduct does not indicate wanton cruelty, a judge could not resort to section 5-5-3.2(b)(2) to calculate the length of his commitment term. *Palmer*, 148 Ill.2d at 92-94, 592 N.E.2d at 950-51.

In contrast, in *Pastewski,* the Court held that the judge properly resorted to section 5-5-3.2(b) in setting the maximum period of the insanity acquittee's commitment, where the acquittee, by reason of his prior convictions, would have qualified for an extended term sentence had he been found guilty. *Pastewski*, 164 Ill.2d at 196-98, 647 N.E.2d at 282-83.

Thus, whether one seeks "the maximum terms authorized under section 5-8-2" as stated in section 5-8-4(c)(2), or "the maximum sentence" as stated in section 5-2-4(b), the path leads to section 5-8-2(a). According to *Palmer* and *Pastewski,* a judge can rely on the higher limits set by section 5-8-2 only if the individual before the court qualifies for those limits under the companion section, 5-5-3.2(b). There is no rational distinction the phrases "maximum sentence" and "maximum terms" used respectively in section 5-2-4(b) and section 5-8-4(c)(2). Both clearly refer to the maximum length of time that a prisoner or insanity acquittee may be confined.

Also, reading section 5-8-4(c)(2) to further limit the total of consecutive sentences when a section 5-5-3.2(b) factor is not present obtains support from the well-recognized notion that a judge is to tailor the punishment to fit the particular case before the court.   *See* Ill. Const. 1970, art. VI, sec. 11 ("All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship"); *People v. Perruquet*, 68 Ill.2d 149, 154, 368 N.E.2d 882, 884 (1977) ("A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case").   Indeed, the legislature has made individualized sentencing one of the purposes of the Code containing section 5-8-4(c)(2).   730 ILCS 5/1-1-2(a) (West 1998) states that one purpose of the Unified Code of Corrections is to "prescribe sanctions proportionate to the seriousness of the offenses and permit the recognition of differences in rehabilitation possibilities among individual offenders[.]"

The defendant acknowledges adverse Appellate Court authority concerning his claim of error, but contends that those opinions are inconsistent with the plain language of the statutory scheme as well as *Palmer* and *Pastewski*.  The Appellate Court has several times held that section 5-8-4(c)(2) allows a judge to impose consecutive sentences totaling more than twice the maximum nonextended terms for the two most serious offenses involved, even though the offender is not eligible under section 5-5-3.2(b) for an extended term for any of his offenses.  In the seminal case, *People v. Woods*, 131 Ill.App.3d 51, 55, 475 N.E.2d 589, 592 (1st Dist. 1985), the Court stated without citation to supporting authority that, "[i]n our judgment defendant has misread section 5-8-4(c)(2), which refers to section 5-8-2 only as a measuring statute.  Defendant need not

-14-

meet the separate qualifications for an extended-term sentence." The Court adhered to *Woods* in *People v. Beck*, 190 Ill.App.3d 748, 546 N.E.2d 1127 (5th Dist. 1989), reasoning as follows:

> In the instant case, as in *Woods*, the defendant has failed to cite authority supporting his argument that, since he is not eligible for an extended-term sentence, the sentencing court could not use the term set forth in the extended-term statute to calculate the aggregate of the consecutive sentences the court could impose. The eligibility requirements for consecutive sentences are stated in the consecutive sentence statute – section 5-8-4 of the Unified Code of Corrections – not in the extended-term statute – section 5-8-2 of the Unified Code of Corrections – and nothing in section 5-8-4 precludes the imposition of consecutive sentences on offenders under the age of 17. *Woods* is persuasive authority for our conclusion that the extended-term statute serves the purpose of a measuring statute for the consecutive sentence statute.

> *Beck*, 190 Ill.App.3d at 763-64, 546 N.E.2d at 1136-37.

More recently, the Court followed *Woods* in *People v. Myrieckes*, 315 Ill.App.3d 478, 734 N.E.2d 188 (3rd Dist. 2000), stating, "[w]e believe, however, that the first district [in *Woods*] correctly construed section 5-8-4(c)(2). The plain language of section 5-8-4(c)(2) refers to the 'maximum terms *authorized*' by section 5-8-2, not to the maximum terms for which a particular defendant is eligible." *Myrieckes*, 315 Ill.App.3d at 482, 734 N.E.2d at 192 (emphasis in original).

*Woods*, *Beck*, and *Myrieckes* are unpersuasive. Certainly the legislature could not have intended that the term "maximum" in section 5-2-4(b) and section 5-8-4(c)(2) have two completely different meanings, especially when in both settings it depends for its meaning on the same statute, section 5-8-2(a). None of these cases can be logically reconciled with the rationale in *Palmer* and *Pastewski*.

Indeed, *Woods* and *Beck* were decided prior to *Palmer* and *Pastewski*, and could not have addressed those opinions. The opinion in *Myrieckes* does not mention either *Palmer* or *Pastewski*, and offers no reason to disregard the logic of this Court in those cases.

The above three Appellate Court opinions also contradict established principles of statutory construction because they ignore or render meaningless the word "authorized" in section 5-8-4(c)(2). A statute should be construed so that no word or phrase is rendered meaningless or superfluous. *Langendorf v. City of Urbana*, 197 Ill.2d 100, 109, 754 N.E.2d 320, 325 (2001). Also, by subtle construction or other means, a court may not read out of a statute a limitation which the legislature has seen fit to enact. *Palmer*, 148 Ill.2d at 85, 592 N.E.2d at 947. Statutory language should be given its plain and ordinary meaning. *Robinson*, 172 Ill.2d at 457, 667 N.E.2d at 1307. Yet, the above Appellate Court opinions have read section 5-8-4(c)(2) as though it were written: "the aggregate of consecutive sentences shall not exceed the sum of the maximum terms *listed* under section 5-8-2 for the 2 most serious felonies involved." (Emphasis added).

What is authorized by section 5-8-4(c)(2) clearly depends on what is "authorized" by section 5-8-2. Section 5-8-2, in turn, is limited by section 5-5-3.2 (b) and linked to section 5-8-1(a). As stated in *People v. Neal*, 111 Ill.2d 180, 204, 489 N.E.2d 845, 855 (1985), "[t]he statute authorizing extended terms refers to and is bottomed on, in a sense, the maximum sentences 'authorized by Section 5-8-1,' to which it refers." When one reads these three sections (5-8-4(c)(2), 5-8-2 and 5-5-3.2(b)) together, it is clear that section 5-8-4(c)(2) prohibits the total of consecutive terms to be based on extended-term sentencing limits unless a judge finds, consistent with section 5-5-3.2(b), that such a factor is present. If no such

-16-

factor is present, the judge shall not sentence an offender to consecutive terms totaling more than the maximum sentences authorized by section 5-8-1 (*i.e.,* nonextended-term sentences) for the two most serious felonies involved.

The Appellate Court's reasoning in this case. adds nothing to the above rationale, nor does it persuasively distinguish *Palmer* and *Pastewski.* The Appellate Court failed to explain why "maximum term authorized" should be treated  differently from "maximum sentence" in light of *Palmer* and *Pastewski.* The Appellate Court noted that this was not an insanity acquittal case without ever addressing the linguistic similarities of the two statutes. *People v. Holmes*, (Appendix, p. A-12).  Further, the Appellate Court relied upon *Wood, Beck,* and *Myrieckes*; yet none of these cases interpreted or addressed *Palmer* or *Pastewski. Holmes*, (Appendix, pp. A-7 - A-10).   In short, the Appellate Court's order provides no reason to treat similar language differently.   This Court should decline to follow the flawed reasoning of the above Appellate Court cases.

The defendant's construction of section 5-8-4(c)(2), section 5-8-2, and section 5–5-3.2(b) is not foreclosed by language in this Court's opinion in *People v. Tucker*, 167 Ill.2d 431, 657 N.E.2d 1009 (1995).   In *Tucker*, Mr. Tucker actually received, and thus apparently qualified for, extended term sentences. *Tucker*, 167 Ill.2d at 437, 657 N.E.2d at 1011-12.  This Court remarked in *dicta* that "section 5-8-4(c)(2) refers to the aggregate of the maximum *extended* terms authorized for the two most serious felonies involved." *Id.* (emphasis in original). Because the circuit court apparently found Tucker eligible for, and imposed extended-term sentences, *Tucker* is consistent with Mr. Holmes' construction of the above statutes.  In Tucker's case, the authorized maximum penalty was the

sum of the maximum extended term penalty for the two most serious convictions.

The statement in *Tucker* was thus *dicta* that reflected an assumption about an issue not presented by that case. Such a statement is not controlling authority. For example, in *People v. Wright,* 189 Ill.2d 1, 10, 723 N.E.2d 230, 236 (1999), this Court held that a defendant's failure to file his post-conviction petition within the limitations period set forth in the applicable statute did not deprive the trial court of jurisdiction to consider the defendant's petition. Along the way, the Court wrote, "we caution that we are not limiting the trial court's ability, during the court's initial review of noncapital petitions [citation omitted], to dismiss the petition as untimely." *Wright,* 189 Ill.2d at 11, 723 N.E.2d at 237. *Wright* involved a second-stage dismissal of the defendant's petition. *Wright,* 189 Ill.2d at 5, 723 N.E.2d at 233.

However, when the issue of the trial court's powers at the first stage of post-conviction proceedings was presented thereafter in *People v. Boclair,* 202 Ill.2d 89, 99, 789 N.E.2d 734, 740 (2002), this Court held that a post-conviction petition may not be dismissed as untimely during the first stage of the proceedings. Referring to the above statement in *Wright,* the Court wrote in *Boclair,* "[t]o the extent that our opinion in *Wright* may be read as holding the contrary to be true, we now expressly overturn that portion of the *Wright* decision." *Boclair,* 202 Ill.2d at 99, 789 N.E.2d at 740.

The example of the *Wright* and *Boclair* opinions shows that *dicta* concerning issues not presented to a reviewing Court cannot be assumed to be controlling. Because *Wright* involved a second-stage dismissal, its statement

-18-

about first-stage dismissals by the trial court was not necessary to its holding, and did not concern an issue presented by that case.

Likewise, the aforementioned statement in *Tucker* about the aggregate of the maximum extended terms was unnecessary to the holding there which was that the phrase in section 5-8-4(c)(2) about the two most serious "felonies involved" made no distinction between offenses committed at the same time and offenses committed at separate times. *Tucker*, 167 Ill.2d at 434-39, 657 N.E.2d at 1011-13. All offenses were subject to the aggregate limitation. 167 Ill.2d at 438-39, 657 N.E.2d at 1013. No challenge was made to Tucker's eligibility for an extended term, and the instant argument was not made to this Court in *Tucker*. *Tucker* is not controlling. The Appellate Court here erroneously treated *Tucker* as if it had been presented with and had ruled upon the issue of whether section 5-8-4(c)(2) mandated reference to extended terms in every case involving consecutive sentences. *Holmes*, (Appendix, pp. A-6 - A-7).

In summary, Mr. Holmes was not found to have qualified for an extended term sentence by the court. Thus, the aggregate of his consecutive sentences for his Class X felonies cannot exceed sixty years. He therefore asks that this Court grant leave to appeal to correct the error in his case.

# VII.

## CONCLUSION

Review by the Supreme Court is warranted to determine an issue of first impression in this Court: whether the phrase "maximum terms authorized" from 730 ILCS 5/5-8-4(c)(2) should be given the opposite meaning from the phrase "maximum sentence" contained in 730 ILCS 5/5-2-4(b), as has been done by the Illinois Appellate Court. The consequences of the Appellate Court's construction has been to raise the maximum sentence available to prisoners who were not found to have qualified for an extended term. Prisoners like Mr. Holmes who are affected by this error have sentences far longer than authorized by law. This Court's guidance is needed to correct the Appellate Court's error, and to illustrate proper statutory interpretation to the Appellate Court.

WHEREFORE, the defendant-petitioner respectfully requests that this Honorable Court grant leave to appeal as a matter of sound judicial discretion under Supreme Court Rule 315 and reverse the decision of the Appellate Court affirming the petitioner's conviction and sentence.

Respectfully submitted,

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750
(217) 782-3654

MARTIN J. RYAN
Assistant Defender

COUNSEL FOR DEFENDANT-PETITIONER

**APPENDIX**

NO. 4-00-0962

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT



| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| GREGORY HOLMES, | ) | No. 97CF1130 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Theodore E. Paine, |
| | ) | Judge Presiding. |

---

ORDER

In December 1997, a jury convicted defendant, Gregory Holmes, of three counts of home invasion (720 ILCS 5/12-11 (West 1996)), one count of armed violence (720 ILCS 5/33A-2 (West 1996)), and nine counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 1996)).  In September 1998, the trial court sentenced Holmes as follows: (1) 15 years in prison on the armed-violence conviction; (2) 10 years on each of the convictions for aggravated criminal sexual assault, to be served consecutive to each other and consecutive to the armed-violence sentence; (3) a consecutive sentence of 10 years on one home-invasion conviction; and (4) a 15-year concurrent sentence on the other home-invasion conviction, for a total of 115 years in prison.  We affirmed Holmes's convictions but vacated his sentence on the armed-violence conviction because the section of the statute under which Holmes was sentenced was found unconstitutional, and we remanded the cause for resentencing on that count. People v. Holmes, No. 4-98-0768 (April 28, 2000) (unpublished

A-1

order under Supreme Court Rule 23).

On October 5, 2000, the trial court resentenced Holmes to 10 years' imprisonment for armed violence, with the sentence to run consecutively to the other counts.  On October 12, 2000, the court denied Holmes's motion to reconsider sentence.  On appeal, Holmes argues that his total sentence is unauthorized by law and therefore void because the total exceeds the maximum term authorized under section 5-8-2 of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-2 (West 1996)) for the two most serious felonies involved.  We disagree.  The total aggregate authorized for Holmes's two most serious felonies was 120 years.  After resentencing, the aggregate of the sentences imposed in this case was 110 years, which was less than what he could have received.  We affirm.

## I. BACKGROUND

In December 1997, a jury convicted Holmes of three counts of home invasion (720 ILCS 5/12-11 (West 1996)), one count of armed violence (720 ILCS 5/33A-2 (West 1996)), and nine counts of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(1) (West 1996)).  The trial court sentenced Holmes to 115 years' imprisonment.  He appealed to this court, arguing (1) the prosecutor's elicitation of his assertion of his right to remain silent was reversible error; (2) he was denied a fair trial due to (a) improper racial remarks made by the prosecutor, (b) the court's failure to evaluate the competency of a child witness, and (c) trial counsel's incompetency in failing to object to the

- 2 -

racial remarks and make a competency objection to the testimony
of the child witness; (3) the State failed to prove him guilty
beyond a reasonable doubt of aggravated criminal sexual assault;
(4) the court erred in denying his motion for substitution of
judge where prejudicial remarks were made by the trial judge at a
political function concerning Holmes's likely sentences; (5) his
combined sentences of 115 years in prison are excessive; (6) he
was entitled to one additional day of sentence credit; and (7)
the cause should be remanded for resentencing on his armed-
violence conviction because Public Act 88-680 (Pub. Act 88-680,
§50-5, eff. January 1, 1995 (1994 Ill. Laws 2750, 2832)), which
increased the minimum penalty for armed violence, violated the
single-subject rule of the Illinois Constitution of 1970 (Ill.
Const. 1970, art. IV, §8(d)).  We affirmed Holmes's convictions
but vacated his sentence on the armed-violence conviction because
the section of the statute under which defendant was sentenced
was found unconstitutional, and we remanded the cause to the
trial court for resentencing.  People v. Holmes, No. 4-98-0768
(April 28, 2000) (unpublished order under Supreme Court Rule 23).

On October 5, 2000, the trial court resentenced Holmes
to 10 years' imprisonment for the armed-violence conviction,
reducing his total sentence to 110 years.  Holmes filed a motion
to reconsider sentence, alleging his sentence was excessive and
the court did not properly consider factors in mitigation.  The
court denied Holmes's motion.  This appeal followed.

- 3 -

A-3

## II. ANALYSIS

Holmes, convicted of all Class X felonies, argues his 110-year prison sentence violates section 5-8-4(c)(2) of the Unified Code (730 ILCS 5/5-8-4(c)(2) (West 1996)) because the term exceeds the sum of the maximum term authorized for the two most serious felonies under section 5-8-2 (730 ILCS 5/5-8-2 (West 1996). Holmes argues the trial court did not make specific findings of aggravation, and therefore, the maximum term for which he is eligible is 60 years under section 5-8-1(a)(1)(d)(3) of the Unified Code (730 ILCS 5/5-8-1(a)(1)(d)(3) (West 1996)). He argues the portion of his sentence in excess of 60 years is void. The State maintains that the plain language of section 5-8-2 dictates that the maximum term authorized for a Class X felony is 60 years, and under section 5-8-4(c)(2), the court was within its discretion to impose a prison sentence of up to 120 years. We agree with the State's interpretation and conclude that defendant does not have to be found eligible for an extended term for the extended-term maximum to apply.

The determination of the maximum sentence to which the trial court could properly sentence defendant turns on our interpretation of several sections of the Unified Code. The appropriate standard of review when interpreting statutes is de novo. People v. Smith, 342 Ill. App. 3d 289, 293, 794 N.E.2d 408, 411 (2003).

At the time of defendant's offenses, section 5-8-4(c)(2) of the Unified Code provided in relevant part that "the

- 4 -

**A-4**

aggregate of consecutive sentences shall not exceed the sum of the maximum terms authorized under [s]ection 5-8-2 for the [two] most serious felonies involved." 730 ILCS 5/5-8-4(c)(2) (West 1996). Section 5-8-2 provided, in relevant part, that "[a] judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by [s]ection 5-8-1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in para- graph (b) of [s]ection 5-5-3.2 were found to be present." 730 ILCS 5/5-8-2(a) (West 1996). We interpret section 5-8-2, as referenced in section 5-8-4(c)(2), as a limitation or cap on the maximum aggregate sentence, which allows a sentence of up to 60 years for a Class X felony (730 ILCS 5/5-8-2(a)(2) (West 1996)). After remand, defendant's sentence consisted of consecutive 10- year terms for each of his 11 convictions, for a total of 110 years. The trial court did not sentence defendant in excess of the maximum sentence authorized by section 5-8-1 for any of his convictions, which were all Class X felonies and carried sen- tences that "shall be not less than 6 years and not more than 30 years." 730 ILCS 5/5-8-1(a)(3) (West 1996). Therefore, his two most serious offenses were Class X felonies, which, pursuant to section 5-8-4(c)(2), authorized the court to impose an aggregate consecutive sentence not to exceed 120 years. Defendant's aggregate sentence totaled 110 years, fewer than 120.

Section 5-8-2(a) prohibits a trial court from imposing a sentence in excess of the maximum sentence authorized by

section 5-8-1 for the class of the most serious offense <u>unless</u>
the factors in aggravation set forth in paragraph (b) of section
5-5-3.2 (730 ILCS 5/5-5-3.2(b) (West 1996)) are found.  730 ILCS
5/5-8-2(a) (West 1996).  Aggravating factors need only be found
where the court wants to impose an extended-term sentence.
Therefore, Holmes's sentence would be excessive only if he had
received either an extended-term sentence or an aggregate sen-
tence in excess of 120 years.  In the present case, the court did
not impose extended-term sentences for any of Holmes's convic-
tions.  Instead, the court sentenced Holmes within the sentencing
ranges set forth in section 5-8-1.  Therefore, the court did not
have to consider the factors in aggravation that a court must
consider in determining whether a defendant is eligible for an
extended-term sentence.  Because the court imposed consecutive
sentences pursuant to section 5-8-4(c)(2), however, the court was
constrained to imposing sentences the aggregate of which did not
exceed the maximum terms authorized under section 5-8-2 for the
two most serious felonies.  See <u>People v. Tucker</u>, 167 Ill. 2d
431, 657 N.E.2d 1009 (1995).

    In <u>Tucker</u>, 167 Ill. 2d at 436, 657 N.E.2d at 1012, the
supreme court found that the aggregate-sentence limitation in
section 5-8-4(c)(2) applied regardless of whether the offenses
were committed at the same or different times.  In <u>Tucker</u>, 167
Ill. 2d at 433-34, 657 N.E.2d at 1011, the defendant was found
guilty of residential burglary, and the trial court sentenced him
to 30 years.  At that time, however, the defendant was already

- 6 -

**A-6**

subject to two consecutive maximum extended prison terms for Class X felonies arising from a different incident.

The defendant appealed, and the appellate court affirmed the defendant's conviction but modified his sentence to run concurrently with his two previously imposed sentences, finding that section 5-8-4(c)(2) prohibited the imposition of consecutive sentences that exceed the sum of the maximum extended terms authorized for the two most serious felonies involved. Tucker, 167 Ill. 2d at 433, 657 N.E.2d at 1011. The State appealed, and the supreme court affirmed the appellate court, holding:

> "a defendant sentenced to consecutive prison terms under section 5-8-4(b) *** may not be sentenced to consecutive sentences that exceed the sum of the maximum extended terms authorized for the two most serious felonies involved, whether those felonies are part of the same or separate occurrences." Tucker, 167 Ill. 2d at 438-39, 657 N.E.2d at 1013.

Similarly, several appellate courts have concluded that under section 5-8-4(c)(2), the aggregate of consecutive sentences cannot exceed the sum of the maximum terms authorized under section 5-8-2 for the two most serious felonies. In People v. Woods, 131 Ill. App. 3d 51, 55, 475 N.E.2d 589, 592 (1985), the defendant pleaded guilty to seven Class X felonies and four Class 1 felonies, and the maximum he could receive for a Class X felony

- 7 -

pursuant to section 5-8-2 of the Unified Code was 60 years.  The
trial court concluded, therefore, that under section 5-8-4(c)(2),
the aggregate of consecutive sentences that could be imposed on
the defendant could not exceed 120 years, which was the sum of
the maximum terms authorized under section 5-8-2 for the two most
serious felonies involved.  <u>Woods</u>, 131 Ill. App. 3d at 55, 475
N.E.2d at 592.  The defendant appealed, arguing that (1) the
trial court was only authorized to sentence him to a maximum of
60 years' imprisonment under 5-8-4(c)(2), and (2) he was not
eligible for an extended-term sentence, and therefore, the
extended-term sentences authorized by section 5-8-2 could not be
used in calculating the aggregate of consecutive sentences
allowed by section 5-8-4(c)(2).  The appellate court disagreed
with the defendant's interpretation of section 5-8-4(c)(2),
stating that section 5-8-2 is merely a measuring statute for
section 5-8-4(c)(2).  <u>Woods</u>, 131 Ill. App. 3d at 55, 475 N.E.2d
at 592; see also <u>People v. Beck</u>, 190 Ill. App. 3d 748, 546 N.E.2d
1127 (1989); <u>People v. Myrieckes</u>, 315 Ill. App. 3d 478, 734
N.E.2d 188 (2000).

In <u>Beck</u>, 190 Ill. App. 3d at 763-64, 546 N.E.2d at
1137, the defendant presented the same argument put forth in
<u>Woods</u>.  The defendant, a minor, argued that because he was not
eligible for an extended-term sentence because of his youth, the
court could not use the term set forth in the extended-term
statute to calculate the length of his consecutive sentences.
The court rejected that argument, reasoning that the requirements

- 8 -

**A-8**

for consecutive sentences are stated in section 5-8-4 of the Unified Code and not in section 5-8-2, the extended-term statute. Beck, 190 Ill. App. 3d at 763, 546 N.E.2d at 1137. Nothing in section 5-8-4 precludes a minor from receiving consecutive sentences. Beck, 190 Ill. App. 3d at 763-64, 546 N.E.2d at 1137. The court found Woods to be persuasive authority in concluding that section 5-8-2 was merely a measuring statute for section 5-8-4(c)(2). Beck, 190 Ill. App. 3d at 764, 546 N.E.2d at 1137.

The same conclusion was reached in Myrieckes, 315 Ill. App. 3d at 481-82, 734 N.E.2d at 191-92, where the defendant argued that section 5-8-2 provides for an extended term for a Class X felony only if section 5-5-3.2(b) factors in aggravation are present. No factors in aggravation were present. As such, the defendant argued that the maximum term he was eligible for under section 5-8-2 was the nonextended term of 30 years. Therefore, the defendant reasoned, the 80-year sentence he received exceeded the 60-year sum of the terms authorized for the two most serious felonies involved. Myrieckes, 315 Ill. App. 3d at 481-82, 734 N.E.2d at 192. The court disagreed with the defendant's interpretation of the statute. The court explained, "[t]he plain language of section 5-8-4(c)(2) refers to the 'maximum terms authorized' by section 5-8-2, not to the maximum terms for which a particular defendant is eligible." (Emphasis in original.) Myrieckes, 315 Ill. App. 3d at 482, 734 N.E.2d at 192. Therefore, the court found that the maximum term authorized under section 5-8-2 was 120 years and the defendant's sentence

- 9 -

**A-9**

was within that range.  <u>Myrieckes</u>, 315 Ill. App. 3d at 481-82, 734 N.E.2d at 192.

In the present case, defendant urges this court not to follow <u>Woods</u>, <u>Beck</u>, and <u>Myrieckes</u>, contending that they are inconsistent with <u>People v. Palmer</u>, 148 Ill. 2d 70, 592 N.E.2d 940 (1992), and <u>People v. Pastewski</u>, 164 Ill. 2d 189, 647 N.E.2d 278 (1995).  We find <u>Palmer</u> and <u>Pastewski</u> factually inapplicable to the case at bar.

In <u>Palmer</u>, the issue presented was whether natural life was a permissible maximum sentence for an insanity acquittee pursuant to section 5-2-4(b) (Ill. Rev. Stat. 1987, ch. 38, par. 1005-2-4(b), now 730 ILCS 5/5-2-4(b) (West 2002)).  <u>Palmer</u>, 148 Ill. 2d at 82, 592 N.E.2d at 945.  Under section 5-2-4(b), a court is required to set the maximum period of commitment for a defendant subject to involuntary admission that does

> "not exceed the maximum length of time that
> the defendant would have been required to
> serve, less credit for good behavior, before
> becoming eligible for release had he been
> convicted of and received the maximum sen-
> tence for the most serious crime for which he
> has been acquitted by reason of insanity."
> 730 ILCS 5/5-2-4(b) (West 2002).

The supreme court stated that a defendant could be committed for the maximum period available under section 5-8-1.  <u>Palmer</u>, 148 Ill. 2d at 86, 592 N.E.2d at 947.  However, for a defendant to be

- 10 -

**A-10**

committed under the extended-term statute, section 5-8-2(a), the trial court must determine that the statutory requirements of that section are met. <u>Palmer</u>, 148 Ill. 2d at 86-87, 592 N.E.2d at 947. Section 5-8-2(a) precludes an extended-term sentence absent the presence of aggravating factors listed in section 5-5-3.2(b). <u>Palmer</u>, 148 Ill. 2d at 87, 592 N.E.2d at 947; 730 ILCS 5/5-8-2(a) (West 1996). Section 5-5-3.2(b)(2) provides that an extended term may be imposed "[w]hen a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." 730 ILCS 5/5-5-3.2(b)(2) (West 2002). The supreme court found, by definition, that an insanity acquittee is not capable of wanton cruelty. <u>Palmer</u>, 148 Ill. 2d at 92, 592 N.E.2d at 950. Therefore, because the statutory requirements of section 5-8-2(a) cannot be met, an insanity acquittee may not be sentenced for a period of commitment by reference to the extended-term statute. See <u>Palmer</u>, 148 Ill. 2d at 88, 592 N.E.2d at 948.

However, recently the supreme court refused to construe <u>Palmer</u> this broadly--as forbidding the extended-term statute from ever being used in determining the maximum period of commitment for an insanity acquittee. <u>Pastewski</u>, 164 Ill. 2d at 195, 647 N.E.2d at 282. Section 5-5-3.2(b)(1) allows the imposition of an extended-term sentence on a felon upon a finding of the existence of an aggravating factor, such as a felon, who, within a specified period of time, has been convicted of committing a felony of the same or greater class. 730 ILCS 5/5-5-3.2(b)(1) (West 2002).

The court reasoned that this provision depended upon wholly objective, historical criteria and did not make reference to a defendant's mental state or intent.  <u>Pastewski</u>, 164 Ill. 2d at 198, 647 N.E.2d at 283.  The insanity acquittee was, therefore, properly committed to an extended term.

In contrast, the present case involved neither an insanity acquittee nor a determination that factors in aggravation set forth in paragraph (b) of section 5-5-3.2 (730 ILCS 5/5-5-3.2(b) (West 2002)) were found to be present.  Moreover, an insanity acquittee found to be subject to involuntary admission or in need of mental-health services on an inpatient basis is to be committed to the Department of Mental Health and Developmental Disabilities for an indefinite period of time.  The Unified Code provides, in relevant part, that the commitment cannot exceed the maximum length of time he would have received had he been convicted of and received the maximum sentence for the most serious crime for which he had been acquitted by reason of insanity.  730 ILCS 5/5-5-3.2(b) (West 2002).  In determining the maximum length of time to commit a defendant, <u>Pastewski</u> noted that the defendant's prior criminal record would have qualified him for an extended-term sentence under section 5-5-3.2(b)(1).  <u>Pastewski</u>, 164 Ill. 2d at 191, 647 N.E.2d at 280.  Therefore, the court relied on that portion of the extended-term statute in determining the maximum period of commitment.

The case <u>sub judice</u> involved consecutive sentences and the aggregate sentence restriction or cap in section 5-8-4(c)(2).

- 12 -

730 ILCS 5/5-8-4(c)(2) (West 1996). Therefore, the trial court relied on that portion of the extended-term statute only to determine the maximum aggregate consecutive sentences to impose. Holmes received all Class X convictions. The court sentenced Holmes pursuant to section 5-8-1 and did not impose any extended-term sentences. Therefore, the court did not have to consider any aggravating factors. Because the court ordered the sentences to run consecutively, pursuant to section 5-8-4(c)(2), however, the aggregate amount of those sentences could not exceed 120 years, the maximum amount allowable for the two most serious offenses as forth in section 5-8-2. Holmes received 110 years, well within the permissible range.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

MYERSCOUGH, J., with KNECHT, P.J., and McCULLOUGH, J., concurring.

- 13 -

A-13

NO. 4-00-0962

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT



FILED

APR 2 1 2004

Clerk of the
Appellate Court, 4th Dist.

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) ) | Macon County, Illinois. |
| vs. | ) ) | No. 97-CF-1130 |
| GREGORY HOLMES | ) ) | Honorable, Theodore E. Paine |
| Defendant-Appellant. | ) | Judge Presiding. |

## Affidavit of Intent to File Petition for Leave to Appeal

## Notice and Proof of Service

DANIEL D. YUHAS
Deputy Defender
Office of the State Appellate Defender
Fourth Judicial District
400 South Ninth, Suite 102
P.O. Box 5750
Springfield, IL 62705-5750

MARTIN J. RYAN
Assistant Defender

COUNSEL FOR DEFENDANT-APPELLANT

A-14

NO. 4-00-0962

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the Sixth Judicial Circuit, |
| Plaintiff-Appellee, | ) ) | Macon County, Illinois. |
| vs. | ) ) | No. 97-CF-1130 |
| GREGORY HOLMES | ) ) | Honorable, Theodore E. Paine |
| Defendant-Appellant. | ) | Judge Presiding. |

## Affidavit of Intent to File Petition for Leave to Appeal

Now comes affiant, Martin J. Ryan, Assistant Defender, Office of the State Appellate Defender, Fourth Judicial District, and states that he is counsel for the defendant-appellant in the above-entitled cause and that he in good faith intends to seek review by the Illinois Supreme Court of this Court's decision in the above-entitled cause by the filing of a Petition for Leave to Appeal pursuant to Supreme Court Rule 315; and therefore, requests this Court to stay the mandate in the above-entitled cause until disposition of the case by the Illinois Supreme Court.

Respectfully submitted,

Subscribed and sworn to
before me on this 21ˢᵗ
day of _____, 2004.

_____
MARTIN J. RYAN
Assistant Defender

_____
NOTARY PUBLIC

COUNSEL FOR DEFENDANT-APPELLANT

OFFICIAL SEAL
NANCY S. CARDINALE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-8-2004

A-15

NO. 4-00-0962

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF<br>  ILLINOIS, | ) <br> ) <br> ) <br> ) | Appeal from the<br>Circuit Court of the<br>Sixth Judicial Circuit,<br>Macon County, Illinois. |
|     Plaintiff-Appellee, | ) <br> ) | |
|     vs. | ) <br> ) | No. 97-CF-1130 |
| GREGORY HOLMES | ) <br> ) <br> ) | Honorable,<br>Theodore E. Paine |
|     Defendant-Appellant. | ) | Judge Presiding. |

## Notice and Proof of Service

TO:   State's Attorneys Appellate               Gregory Holmes
      Prosecutor                              Register No. K-04785
      725 South Second Street             Box 711
      Springfield, IL 62704                Menard, IL 62259

      Scott Rueter, State's Attorney
      Macon County Courthouse
      253 E. Wood Street
      Decatur, IL 62523

     Please take notice that the original of the Affidavit of Intent to File Petition for Leave to Appeal is being delivered to the Clerk of the Appellate Court and that I am serving the SAAP by State of Illinois Messenger Service and the State's Attorney and appellant by depositing their copies in the mail in Springfield, IL, in envelopes with sufficient prepaid postage and addressed as indicated above on this 21ˢᵗ day of _April_____, 2004.

_Melissa M. Redd_
MELISSA M. REDD
Legal Secretary

Subscribed and sworn to
before me on this _21ˢᵗ_
day of _April_____, 2004.

_May S Cardinale_
NOTARY PUBLIC

```
OFFICIAL SEAL
NANCY S. CARDINALE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-8-2004
```

**RECEIVED**

MAY 2 6 2004

**CRIMINAL APPEALS**

A-16

Page 2 of 2   **E-FILED**
Thursday, 06 July, 2006   11:00:44 AM
Clerk, U.S. District Court, ILCD



124 S.Ct. 2417            Page 1

541 U.S. 1076, 124 S.Ct. 2417, 72 USLW 3732, 158 L.Ed.2d 988
**(Cite as: 541 U.S. 1076, 124 S.Ct. 2417)**


Briefs and Other Related Documents

       Supreme Court of the United States
       Gregory L. **HOLMES**, petitioner,
               v.
         ILLINOIS.
         **No. 03-9587.**

         June 1, 2004.

Petition for writ of certiorari to the Appellate Court
of Illinois, Fourth District, denied.

U.S.,2004
Holmes v. Illinois
541 U.S. 1076, 124 S.Ct. 2417, 72 USLW 3732,
158 L.Ed.2d 988

Briefs and Other Related Documents (Back to top)

• 03-9587 (Docket) (Mar. 29, 2004)

**END OF DOCUMENT**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D

## U.S. District Court
## Central District of Illinois (Urbana)
## CIVIL DOCKET FOR CASE #: 2:06-cv-02090-HAB-DGB

Holmes v. Hulick
Assigned to: Judge Harold A. Baker
Referred to: Magistrate Judge David G. Bernthal
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 05/08/2006
Jury Demand: None
Nature of Suit: 530 Habeas Corpus
(General)
Jurisdiction: Federal Question

**Petitioner**

**Greigory Holmes**

represented by **Greigory Holmes**
K04785
MCC
Menard Correctional Center
711 Kaskaskia St
Menard, IL 62259
618-826-5071
PRO SE

V.

**Respondent**

**Donald Hulick**
*Warden, Menard Correctional Center*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/08/2006 | 1 | PETITION TO PROCEED IN FORMA PAUPERIS filed by Greigory Holmes. (Attachments: # 1 Letters from Petition re in forma pauperis) (MT, ilcd) (Entered: 05/08/2006) |
| 05/08/2006 | 2 | PETITION for Writ of Habeas Corpus - Part 1 (Filing fee $ 5; Receipt U4883) , filed by Greigory Holmes. (Attachments: # 1 Petition for Habeas Corpus - Part 2)(MT, ilcd) (Entered: 05/08/2006) |
| 05/08/2006 | 3 | MOTION to Appoint Counsel by Petitioner Greigory Holmes. Responses due by 5/22/2006 (MT, ilcd) (Entered: 05/09/2006) |
| 05/09/2006 | 4 | ORDER entered by Judge Harold A. Baker on 5/9/06. On May 8, 2006, petitioner Greigory Holmes submitted a petition under 28 U.S.C. 2254, and an application to proceed without prepayment of fees on his petition 1. Also on that date, he paid the $5.00 filing fee. The application to proceed without prepayment of fees 1 is denied as moot. The motion for appointment of counsel 3 is denied. This court now orders that the respondent has sixty (60) days to file a response to the petition pursuant |

to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. This court further orders that the respondent should attach those portions of the state court record which are relevant to the petitioner's claims and to the issues of exhaustion of state remedies and procedural default. Miscellaneous deadline for Respondent to file a response to the petition is 7/10/2006. (VB, ilcd) (Entered: 05/09/2006)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/18/2006 09:54:26 | | | |
| **PACER Login:** | ia0009 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:06-cv-02090-HAB-DGB |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |